E. H. PENDLETON, Respondent, v. H. H. ASBURY, Appellant.

Kansas City Court of Appeals, February 1, 1904.

1. **CONTRACTS: Public Policy: Agreement Between Rival News-papers.** An agreement between proprietors of rival newspapers that they will bid the same for all public printing in the county, and that such bid shall not be less than the maximum legal rates, is a contemplated raid on the county treasury and is *contra bonos mores* and can not be upheld and enforced.

2. ———: ———: **Trial Practice.** When any party to an illegal contract can not open his case without showing he has broken the law the court will not assist him whatever his claim in justice may be.

Appeal from Dallas Circuit Court.—*Hon. Argus Cox,* Judge.

REVERSED.

*J. W. Miller* and *John S. Haymes* for appellant.

(1) The contract sued on is without consideration. It is void, because illegal and against public policy.

Where plaintiff's own evidence shows the transaction to be illegal or against public policy, he can not recover. Parsons v. Randolph, 21 Mo. App. 353; Harrison v. McCluney, 32 Mo. App. 481; Woods v. Mosier, 22 Mo. 333; Lawlin v. Bradley, 13 Mo. App. 361. (2) Contracts that may injuriously affect the public will not be enforced. Nash v. Kerr, 19 Mo. App. 1; Reed v. Pepper, 2 Mo. App. 82; Kribben v. Haycraft, 26 Mo. 396; Porter Jones, 52 Mo. 399. (3) Where parties enter into illegal contract the law will leave them where they placed themselves. Attaway v. Bank, 93 Mo. 485. A contract which is illegal in part is illegal in all. Summers v. Summers, 54 Mo. 340; Bick v. Seal, 45 Mo. App. 475; Wait v. Bartlett, 53 Mo. App. 378. (4) And there is no difference in an illegal contract and one immoral or against public policy. Buckingham v. Fitch, 18 Mo. App. 91. The contract is void for want of mutuality. Bishop on Contracts (Edition 1878), sec. 429; Webster's Dictionary, title "Mutuality;" Burrell's Law Dictionary, title "Mutuality;" 1 Carson on Contracts (6 Ed.), side page 449.

*O. H. Scott* for respondent.

(1) There is not a scintilla of evidence in this case to the effect that the parties to this cause made any agreement fixing the price of printing the financial statement for the county, or the constitutional amendments for the State. The contract was perfectly proper. Both were publishing papers, and the publication of both papers would give greater publicity to these matters of general public interest. The agreement was not against public policy, but was legitimate and commendable. (2) A contract will not be presumed against public policy when it can be construed as valid and legal. Beach on Contracts, secs. 1460, 1498; Haarstick v. Shields, 11 Mo. App. 602. (3) Defendant (appellant) had the contract of printing the constitutional amendments. For the

good of the public he could extend the publication to another paper and agree to pay therefor. Having done this and accepted the benefits he shall comply with his contract. Tureman v. Stephens, 83 Mo. 218; Ferry Co. v. Railroad, 73 Mo. 389. (4) Regardless of the contract as to county printing he is under implied obligation to pay the debt sued for in this action, and is estopped from setting up the defense pleaded.

SMITH, P. J.—This is an action on account to recover $55.62 for publishing certain constitutional amendments in the Buffalo Reflex, a newspaper of which plaintiff was the proprietor. The plaintiff had judgment in the circuit court and the defendant appealed.

The facts appearing directly, or by inference, from the record are that in 1900 at the county of Dallas, in this State, the plaintiff was the publisher of a newspaper called the Reflex, and the defendant was the publisher of that called the Record. These two papers the expositors of the principles of opposing schools of political thought. They were published in a county very limited in territory, sparsely populated and moderate in wealth. The gleaning for two newspapers in such a narrow and scant field was by no means encouraging. And just how to build up and maintain two rival newspapers in it became a problem that sorely taxed the combined genius of both plaintiff and defendant. The paramount question was constantly arising and "like the ghost of Banquo will not down" was, "what shall I do to be saved?" And while their political, financial, and perhaps social interests under other conditions would have geen inimical, the one to the other, yet, the very barrenness of the field and the helplessness of the condition in which they found themselves was a warning to them that a protracted existence would be rendered possible only by a combination of their energies. Thus it was they became, "Two souls with but a single

thought, two hearts that beat as one." A "fellow feeling made them wondrous kind," and under the influence of a menacing an adversity, "the lion and lamb" were made to lie down together in apparent peace. Such environment brought them closer together. Conference and suggestion resulted. After "taking counsel of their fears" they concluded it would be "unprofessional" for either to do any public printing for less than the "legal rates."

The plaintiff and defendant having the only two newspapers in the county entered into an agreement which provided, amongst other things, that each would bid the same rate for publishing the financial statement of the county, which they did accordingly. The county court seeing to what complexion it was thus reduced proposed to plaintiff and defendant that if they would each make the publication in his paper that it would pay the rate bid therefor dividing such amount equally between them. By this combination competition was eliminated from the problem and the public was forced to pay double what, but for such combination, it otherwise would have been required to pay for the publication.

By the agreement, to which we have already referred, the plaintiff and defendant were not to bid against each other for the county printing nor was either to do such printing for less than a rate agreed upon, and that each should publish the constitutional amendments and that the proceeds received for the current year for all State and county printing should be equally divided between them, or, as a witness for plaintiff testified, "they had an agreement about publishing the two accounts and that they were to divide up on them what they got out of them—divide up the spoils, was the way I understood it." The agreement covered all the State and county printing required to be done in the county. None of the county printing was to be done for less than the maximum rate allowed by law. The Sec-

retary of State who, it may be inferred, belonged to the same political party as the defendant, was authorized by the statute to designate the newspaper in which the constitutional amendments were to be published in that county. The clerk of the county court who, it may be also inferred, was of the same political party as the plaintiff, was authorized to contract for the printing of the election ballots. It was not an unreasonable expectation that the Secretary of State would designate the defendant's paper as that in which the publication of the constitutional amendments should be made; nor was it to be less reasonably to be expected by the plaintiff that he would be awarded by the county clerk the job of printing the election ballots which was required to be done at the expense of the county.

The plaintiff and defendant each sharing in the common desire to realize as much as possible out of the public printing required in said county entered into said treaty stipulations to the further effect that neither would do any county printing for less than the maximum rate allowed by statute, and that each should publish the constitutional amendments, the county financial statement and that each should print one-half of the ballots to be ordered by the clerk, and divide equally the whole amount received; or, in other words, it was agreed that plaintiff and defendant should bid the same rate for the publication of the county statement and when made they would not only divide the proceeds arising from doing that printing, but, also, the amount received for all other printing done that year for either the State or the county. The manifest purpose of the agreement was to do away with competition for the publication of the county financial statement and to compel the payment of a double rate therefor, which was to be divided, and to secure a division between them of the proceeds arising from the doing of all the other public printing required in the county. The scheme was one that embraced the doing of several things, but the principal

thing to be accomplished by it was to compel the county to pay a rate for the publication of the county financial statement sufficiently large and remunerative to justify not only a division of it, but of the proceeds of all the other public printing required in the county. The promise of the defendant to divide the proceeds received for the publication of the constitutional amendments was a part of the combination scheme.

The scheme provided by the agreement contemplated a spoliation—a raid on the county treasury. It was *contra bonos mores*. It must be condemned by every consideration of public policy. It can not be upheld. Parsons v. Randolph, 21 Mo. App. 353; Harrison v. McCluney, 32 Mo. App. 481. Though the amount in controversy is insignificant, yet the principle involved is one of the greatest importance.

It is true that the claim of the plaintiff is for the publication of the constitutional amendment; yet, this claim is founded on the illegal agreement—is a part of it, and without which it has no foundation on which to rest. But the plaintiff contends that as the agreement provided for the publication of the county statement in both papers that a greater publicity was given to it, and it was therefore not against public policy.

The Legislature has by statute required that a publication of the county financial statement be made in "some" (one) newspaper printed in the county—section 6793, Revised Statutes—and has fixed the maximum rate for such publication—section 4688, Revised Statutes. The effect of the agreement here was to require the county court to pay for the publication in two papers instead of one, and to pay just double what it otherwise would have been required to pay. The combination agreement so entered into and executed was, it seems to us, but a fraudulent trick by which the parties thereto were enabled to appropriate to their own use out of the county treasury a sum of money to which they had no lawful right. The rule has been declared to be that,

when either party to the illegal contract or transaction applied to a court for aid, if the plaintiff can not open his case without showing he has broken the law, the court will not assist him, whatever his claim in justice may be upon the defendant. No court will lend its aid to a man who founds his cause of action upon an immoral or illegal act. The principle of public policy is *ex dolo malo non oritur actio*. Hatch v. Hanson, 46 Mo. App. 323; Connor v. Black, 119 Mo. 126.

The plaintiff's cause of action was founded upon the illegal agreement to which we have referred and can not therefore be enforced. The instruction in the nature of a demurrer to the evidence should have been given. The judgment must be reversed. All concur.