King, J.,
rendered the opinion of the court.
*339 The complaint contains three counts, or causes of action. The first alleges that at the special instance and request of Oliver (plaintiff in error, defendant below) plaintiff printed 3500 copies of certain proposed Constitutional Amendments and Referred Laws, for which the defendant promised to pay plaintiff $101.00; the second alleges that plaintiff was the general manager of The Alamosa Courier, a weekly newspaper published at Alamosa, Conejos County, and that in October,and November, 1912, at the special instance and request of defendant, plaintiff published, in said newspaper certain legal advertisements known as Constitutional Amendments and Referred Laws, for which publication defendant promised to pay plaintiff $557.17; the third alleges that The La Jara Chronicle was a weekly newspaper published at LaJara, Conejos County, by L. Erl Bigelow, and that Bigelow, at defendant’s special instance and request, published in said newspaper the aforesaid Constitutional Amendments -and Referred Laws, for which the defendant agreed to pay Bigelow $557.17, and Bigelow assigned his claim to plaintiff.
For answer defendant pleaded a general denial, and that the contracts sued on, if made, were contrary to public policy, and therefore illegal and void, for reasons which will be stated in connection with the proof.
The cause was tried to a jury, and the court seems to have decided the affirmative defense adversely to the defendant, and submitted to the jury only the question as to whether or not Oliver had agreed to pay Wilder and Bigelow for publication of the matter in their papers, and to -pay Wilder for printing the aforesaid copies. Upon that issue the jury found for plaintiff in the sum of $1215.34.
In 1912 James B. Pearce was Secretary of State, and as such was charged with the duty, and vested with- the authority, to contract for the publication of initiated and referred bills and constitutional amendments to be submitted at the general election to be held in November.
*340 Concerning initiated and referred measures the Constitution provides that:
“The text of all measures to be submitted shall be published as- constitutional amendments are published.” Section 1, article V, as amended in 1910.
Section 2 of article XIX, in relation to proposed amendments to the Constitution; provides that:
“The Secretary of State shall also cause the said amendment or amendments to be published in full in not more than one newspaper of general circulation in each county, for four successive weeks previous to the next general election for members of the general assembly.” (Italics ours.)
Section 1423, Gen. Stats., 3934 R. S. ’08, 4488 M..A. S. T2, fixes the maximum fees that may be paid for legal advertisements. It further provides that:
“Any public or municipal officer or board created or existing under the laws of this state that has now, or may hereafter be authorized by law to enter into contracts for the publication of legal advertisements, is hereby authorized, subject to other limitations on said authority, now imposed by law, to agree to pay therefor prices not exceeding said rates.” (Italics ours.)
Section 4489 M. A. S. ’12, 3935 R. S. ’08, defines legal advertisements, and contains the following proviso:
“Provided, however, that any contract providing for payment for such notice at a lesser sum than is provided in said act 1423 shall be valid.”
Acting presumably under the authority of the foregoing.constitutional and statutory provisions, Mr. Pearce, then a candidate on the' democratic ticket for re-election, sent a circular letter to the democratic newspapers of the state, reading as follows:
“Dear Sir :
The law governing the publication of constitutional amendments requires that such publication shall be made *341 under and by authority of the Secretary of State. The time for publication is close at hand, and I am anxious, where'two or more democratic newspapers are printed in one county, that the owners of those newspapers should agree on the particular newspaper which shall print the amendments. I am also desirous that there shall be no misunderstanding whatever over those agreements, and that the newspapers which shall be parties to them shall give loyal and unstinted support to every nominee on the democratic ticket — national, state and county.
In furtherance of this general understanding I would appreciate your presence in my office at your first convenience, not later than ten days after next Monday, September 16, when I will go more into detail with you.
Faithfully yours,
James B. Pearce.”
Defendant herein (Mr. Oliver) received one of these, letters and went to the office of the Secretary of State and made an arrangement with him whereby it was understood that Oliver was to be awarded the contract for such publications in his newspaper at the maximum rate, and that. Oliver was to pay The LaJara Chronicle 25% of said contract price. A few minutes after Oliver left the office with that understanding, Pearce wrote and caused to be delivered to Oliver at Denver the following letter:
“A. Oliver,
Denver.
Dear Sir:
Everything off; must make new arrangement for benefit of party in your county relative to printing.
Get Bigelow, Wilder and yourself come to office in morning.
Yours,
James B. Pearce.”
Oliver was owner and publisher of The Alamosa Independent, a democratic newspaper having a circulation of *342 about six or seven hundred. Bigelow’s paper, also democratic, had a circulation of perhaps twelve or fourteen hundred. Wilder was not a democrat, and his paper was not democratic, but he and Pearce were friends. • His paper had a circulation of approximately twenty-five hundred. In compliance with the letter last quoted, Bigelow, Wilder and Oliver met with Pearce at his office September 24, the next morning after the letter was written. As the result of the conversation that then and there took place, the parties thoroughly understood that the publisher to whom the contract should be awarded must agree to divide the contract price with the other two, and, according to the testimony of Pearce, his deputy, Dillon, Wilder and Bigelow, an oral agreement was there made by which Oliver was to be awarded the contract at.the maximum price, which he was to divide with Wilder and Bigelow.
Although by his answer Oliver denied that he made the agreement for, or assented to, such division, and the plaintiff by his reply admitted that Oliver did not so consent, nevertheless in proving plaintiff’s case, Pearce and others testified that Pearce insisted that such an agreement be made by and between the three publishrs; that Wilder said one-third would be satisfactory to him, Bigelow said the same, and that Oliver consented thereto. Several witnesses testified that Dillon was called in to take a note of the understanding; that he had had it typewritten and had read it to Wilder, Bigelow and Oliver in the presence of the Secretary of State, and that all three had agreed thereto. That agreement provided that Oliver should be awarded the contract at the maximum price, and that he should divide with the other two, giving each of them one-third. Pursuant to that arrangement, a written contract was made on October 1st, between Pearce and Oliver, which specified the items necesary to be published, and that Oliver would publish the same in four successive issues of The Alamosa *343 Independent Journal, in accordance with section 1423 aforesaid.
Another matter was discussed at the office of the Secretary of State, which is the foundation for the first cause of action. Wilder offered to print the sheets containing the matter for publication, for the three newspapers, and agreed to furnish them at as low a price as they could be obtained elsewhere. He claimed that Oliver assented thereto. In accordance with that understanding Wilder printed the sheets, but Oliver refused to take them. The Western Newspaper Union furnished the necessary printed matter. to Oliver for $69.43. It made a price to Bigelow of $68.75 for his paper. Wilder charged $116 for printing the entire publication, but deducted $15 for press work made unnecessary by Oliver’s refusal to take the copies for his paper, and sued for the balance, $101. The actual cost of the legal publication was less than $75. • The amount contracted for by the Secretary of State and paid to Oliver was $1782.87, the maximum fee allowed by law. Oliver repudiated the oral agreement, for which reason the Secretary of State withheld the contract price for. a time, but finally paid it to Oliver.
1. All contracts in contravention of public policy are void. The principal contention made by defendant in the trial court relied on in this court is thsit the contracts sued on are 'contrary to public policy. No other question requires more than a passing notice.
It seems strange that there is not to be found any express legislative inhibition against agreements of this kind, whereby the public policy of the state in that respect is declared. In the absence of such legislation the court, to declare a particular agreement void on the ground that it is opposed to public policy, must find that such contract has a tendency to injure, the public, is against the public good, or inconsistent with sound policy and good morals, as to the consideration or thing to be done. But if, by well-settled *344 judicial precedent, it has been determined that certain contracts tend to injure the public, or that they are inconsistent with sound morality, the law thus declared is equal in force and effect to a statute, and the court should follow it. It is, an undoubted principle of the common law that the court will not lend its aid to enforce a contract to do anything which tends to corrupt or contaminate, by improper or sinister influence, the integrity of our social and political institutions. Our own Supreme Court has defined public policy, with respect to the administration of the law, as “that rule of law which declares that no one can lawfully do that which tends to injure the public, or is detrimental to the public good.” Russell v. Courier P. & P. Co., 43 Colo., 321, 95 Pac., 936. Public officers in discharging their official duties, should act solely from high considerations of the public welfare, and a desire to faithfully and honestly perform such duties; hence, whether the officer acting is an executive, legislative or judicial officer, the courts condemn every agreement and act, the tendency or object of which is to sully the purity or mislead the. judgment of those to whom the high trust is confided, or to substitute for considerations of public duty and welfare considerations based on the moral weakness, personal obligations or cupidity of the officer, or his desire for re-election, or support for some political party. Mechem, Public Officers, Sec. 359; Tool Co. v. Norris, 2 Wall., 45, 17 L. Ed., 868; 9 Cyc., 485. In determining whether a given contract contravenes public policy, the test is not always nor necessarily what acts the parties performed or contemplated, in order to fulfill their agreement, or its actual result, but rather whether its tendency is evil. Russell v. Courier P. & P. Co., supra, page 326; Wood v. Casserleigh, 30 Colo., 287, 71 Pac., 360, 97 Am. St., 178; Tool Co. v. Norris, supra; McMullen v. Hoffman, 174 U. S., 638, 43 L. Ed., 117, 19 Sup. Ct., 839; Richardson v. Crandall, 48 N. Y., 348; Atcheson v. Mallon, 43 N. Y., 147, 3 Am. Rep., 678. Among the contracts generally *345 denounced as against public policy are those which contemplate the use of improper or sinister influences to procure contracts from'the government or heads of departments of the government, for furnishing supplies to, or for the performance of other services for, the public. Greenhood, Public Policy, page 363; Mechem, Public Officers, Sec. 362; Marshall v. B. & O. R. R. Co., 21 U. S., 153, 16 How., 314, 14 L. Ed., 953; Pendleton v. Asbury; 104 Mo. App., 723, 78 S. W., 651, and cases heretofore cited. In Tool Company v. Norris, supra, page 554, the court announced, as a general principle of the law, that:
“All contracts for supplies should be made with those, and with those only, who will execute them most faithfully, and at the least expense to the government. Considerations as to the most efficient and economical mode of meeting the public wants should alone control, in this respect, the action of every department of the government. No other consideration can lawfully enter into the transaction, so far as the government is concerned. Such is the rule of public policy; and whatever tends to introduce any other elements into the transaction is against public policy. Thát agreements, like the one under consideration, have this tendency, is manifest. They tend to introduce personal solicitation and personal influence as elements in the procurement of contracts; and thus directly lead to inefficiency in the public service, and to unnecessary expenditures of the public funds.”
It is also there held that all such agreements “are void as against public policy, without reference to the question whether improper means are contemplated or used in their execution.” No language at our command can more fitly express the duty of public officials or the tendency of the contract under consideration in the instant case, than the foregoing excerpt from the opinion of Mr. Justice Field. Such being the principle of public policy as sanctioned by the common law and expounded by the ablest jurists, our *346 conclusion is that the agreement upon which the second and third causes of action are based belongs to that class of contracts the tendency of which is evil and which the courts Will not enforce.
2. But the conception We entertain of our duty to the public will not permit us to rest our conclusions solely on the ground that the contract is one of evil tendency. It is in itself palpably vicious and corrupt in conception, consideration and purpose, and necessarily baneful in effect. Indeed it is impossible to accurately predict the vicious results to be apprehended as the natural effect of such an -agreement. The letter of the Secretary of State which we have quoted, supplemented by as much of the evidence as is necessary to make the meaning of the letter plain, exposes beyond doubt the unlawful purpose of the agreements solicited by the letter, and the influence or considerations, and, if necessary, coercion,- to be used in effectuating that purpose. The letter impresses upon the recipient the fact that the Secretary of State controls the publication and lets the contract therefor, but that in counties where two or more democratic papers are published he is anxious that the owners thereof agree upon one paper to which the contract shall be awarded as required by law, thereby delegating to the newspaper owners the exercise of the discretion in selection which the law entrusts to him alone.
In exchange for this substitution of newspaper owners’ agreement in place of the exercise of his own discretion in the selection, Mr. Pearce exacts of the newspapers becoming parties thereto “loyal and unstinted support to every nominee on the democratic ticket — national, state and county.” As the law stands, only one newspaper in each county can be awarded a contract and paid a contract price, and it does not appear from the letter what consideration the other newspapers were to be offered as an inducement for such an agreement, but that feature was left for determination at the conference in Secretary Pearce’s office *347 to which his letter invited them “in furtherance of this general understanding.” When they have so met, they are told, as a condition precedent to a selection of one newspaper, to which the contract shall be awarded, that there must be an agreement between the several parties interested as to a division among themselves of the fees which shall be paid to the one receiving the contract, in consideration of which the fee to be so paid shall be the maximum allowed by statute. In the instant case, when these conditions, considerations and exactions were made known and consented to, the practical effect of the contract entered into was that Oliver agreed to perform all the services required by the Constitution and the law; that is to say, to publish the initiated and referred laws and constitutional amendments for four successive weeks, for $594.27, one-third the maximum fee allowed by law, and that the remaining two-thirds of said sum, to-wit, $1188.54, should be paid to Wilder and Bigelow, ostensibly for making publications which, the law neither directed nor permitted to be made at the expense of the state, but actually in consideration of the agreement to support certain candidates, including Mr. Pearce. The fact that the entire sum fixed was to be first paid to Oliver, and that he was to deliver two-thirds thereof to the others, does not make the contract less vicious. It was but a palpable subterfuge which in effect evaded the law while it appeared to comply therewith, and we believe it was entered into with that purpose. We look to the substance of the entire transaction, and not to the empty form of the later written agreement. No judicial precedent cited affords an exact parallel to the circumstances here disclosed. Usually the employment, contract or combination, denounced,, has been made by outsiders, to influence, control or affect the actions of the public official, without his knowledge of the intention or of the means used to secure official favor; while here the official offered the corrupt inducement, • to which the plaintiff and defendant lent willing ears.
*348 No attempt was made by the Secretary of State to secure the publication at a price less than the maximum, as he is clearly authorized to do under the provisions of Sec. 1423 aforesaid, although he admits that such contract price was known to be excessive; it was, to use his own words, “what we call ‘velvet’ ”; and he admits that the practical effect of the contract he made was to secure the legal publication by Oliver, in Conejos County, for one-third the maximum rate; that in some of the counties of the state it only cost one-fifth of the maximum rate; that it was a matter of common knowledge that the publication could be made for much less than the legal rate; that the condition shown to exist in Conejos County prevailed in every one of the sixty-two counties of the state; and that “each county had one man that had the contract, and then the newspapers got together amongst themselves and arranged the division.”
The true construction of the above mentioned constitutional and legislative provisions contemplates that the publication of such measures shall be obtained at a reasonable cost to the people, and any flagrant departure from that construction is in violation of a sound public policy. Whatever the statute permits a.public officer to do, manifestly in the interest of the public, it is his duty to perform. Therefore, public officers who fail or refuse under these publication acts to make an honest effort to secure for the people as good terms as they would endeavor to secure for themselves, if they personally had to make the payment, falls, short to the extent of carrying out the spirit of the law; and the abuse of these provisions in any manner which tends to increase the reasonable and necessary cost for the work to be done is detrimental to the public and contrary to public policy. Whoever joins in any bargain or arrangement which prevents, or has a tendency to prevent, the public from obtaining such publication at a reasonable cost should *349 not receive the countenance of the courts, nor their aid in collecting any money so contracted for.
In the face of the letters and the evidence, the purpose, nature, effect and size of the graft is manifest, and amounts in the aggregate to approximately $75,000 in excess of the amount necessary to be paid to procure the publication throughout the state, in the mode and for the time required by the constitution. In addition to the extravagant and unlawful expenditure of the public funds, disclosed by the evidence, it is obvious that the natural result, and the 'desired purpose of the agreement, was to direct and control the political policy of the public press. If the press may be debauched by such means, then indeed may we regard our social and political institutions in jeopardy at the hands of its legally constituted guardians.
3. Counsel for defendant in error invoke the benefit of a rule sometimes announced, to the effect that if the plaintiff’s complaint does not disclose an illegal transaction, or if the plaintiff does not require the aid of such a transaction to establish his case, then the defendant cannot allege and rely upon an illegal or invalid consideration or agreement to which he was a party. A sufficient answer to this contention is that the plaintiff was unable to establish his case without disclosing that it was founded on a consideration and agreement contrary to public policy. Moreover, the rule invoked has been repudiated by the courts of this state, and is not the law in this jurisdiction; Branham v. Stallings, 21 Colo., 211, 40 Pac., 396, 52 Am. St., 213; McConnell v. Schultz, 23 Colo. App., 194, 199, 128 Pac., 876; Abernathy v. Wright, Colo. App., Apr. 12, 1915; in all of which the rule is announced that if, from the plaintiff’s own stating or otherwise, the cause of action appears to arise ex turpi causa, the court will render no assistance. In Coppell v. Hall, 7 Wall., 542, 558, 10 L. Ed., 244, the court said:
*350 Decided May 10, A. D. 1915.
Rehearing denied June 14, A. D. 1915.
“Wherever an illegality appears, whether the evidence comes from one side or the other, the disclosure is fatal to the case.”
4. The application of the rule in this case is in no respect for the protection of the defendant, but solely for the protection of the public. The defendant and the plaintiff are in pari delicto. The court regrets its inability in this action to require defendant to return to the treasury of the state the entire sum he received under the illegal agreements.
The court is of the opinion that the agreement sued on in the first cause of action is not so inseparably connected with the other contracts that the vice inherent in the latter necessarily defeats the former also.
In conclusion, we call the attention of the General Assembly to the crying necessity for remedial legislation, which will effectively prevent the recurrence of such practices as are here disclosed, with suitable punishment for infraction of the law in that respect. The judgment is reversed and the cause remanded, with directions to enter judgment for defendant upon the second and third causes of action; and for the plaintiff upon the first cause of action, in the sum of $101.00.

Reversed with Directions.