Dr. Fred PIERCE, Petitioner,

v.

ST. VRAIN VALLEY SCHOOL DISTRICT
RE–1J, Dr. Milton Etter, Kathy Hall,
Martin Block, Sandra Manly, Michael
Shaw and Jim Martinsen, Respondents.

No. 97SC355.

Supreme Court of Colorado,
En Banc.

May 17, 1999.

Overton & Feeley, P.C., Jane G. Ebisch, Vinton, Nissler, Allen & Vellone, P.C. Kristen L. Mix Denver, Colorado, Attorneys for Petitioner.

Semple, Miller, DeLay & Mooney, P.C., Martin Semple, Patrick B. Mooney, Denver, Colorado, Attorneys for Respondents.

Justice KOURLIS delivered the Opinion of the Court.

In this case, a former school district superintendent seeks review of the court of appeals' decision in *Pierce v. St. Vrain Valley School District RE–1J*, 944 P.2d 646 (Colo. App.1997), affirming the trial court's dismissal of his claims against the school district for breach of a settlement agreement entered into by the school district and the superintendent at the time of his resignation. We conclude that the terms in the agreement providing for confidentiality regarding certain allegations against the superintendent and precluding disparaging public remarks are enforceable against the parties to that agreement.[1] We therefore reverse the decision of the court of appeals and remand this case for further proceedings.

## I.

Petitioner Dr. Fred Pierce was employed as the Superintendent of the St. Vrain Valley School District RE–1J (District) from August 1990 until August 1994. In mid–1994, the District's Board of Education (Board)[2] initiated an investigation into complaints of sexual harassment that female employees of the District had made against Dr. Pierce. The independent investigator who conducted the investigation provided the Board with a detailed report in which she concluded that there was a basis for the complaints. In response to the report, the Board asked Dr. Pierce for his resignation.

Dr. Pierce agreed to resign his position pursuant to the terms and conditions of a written settlement agreement he entered into with the Board on August 7, 1994.[3] The terms of the agreement relevant to this action are the following:

> Dr. Pierce will announce that he is resigning for "personal reasons."

> The District shall not make any public statements that are inconsistent with or contradict [that announcement].

> [T]he fact of and details of a recent investigation by the School Board into certain allegations made by certain persons will be and will remain confidential, unless agreed in writing by the parties or subject to court order.

> The District and Dr. Pierce mutually agree that there will be no disparaging public comments or remarks made by either party to this Agreement.

---

1. The two issues before the court on certiorari are:

    1. Whether the First Amendment of the United States Constitution and article II, section 10 of the Colorado Constitution bar enforcement of the confidentiality provision of the settlement agreement in this case.
    2. Whether Colorado's Open Records Act establishes a clear public policy rendering unenforceable the confidentiality provision of the settlement agreement in this case.

2. The respondents in this action are the District and the individuals who were members of the Board in 1994.

3. The agreement lists the parties as "the St. Vrain Valley School District RE–1J, its directors, agents and employees" and "Fred Pierce, Ph.D." At oral argument, however, Dr. Pierce conceded that agents and employees of the District other than the Board members could not be bound by the agreement. We address the enforceability of the agreement only as it relates to the Board members, the District, and Dr. Pierce.

The parties also agreed that the District would provide Dr. Pierce with a good recommendation and would pay him the sum of approximately $160,000, which included benefits and unused vacation pay, as well as $118,850 as consideration for his release of any age discrimination or other potential claims against the District in connection with his employment.

On August 31, 1994, an article in *The Denver Post* detailed the financial aspects of the agreement and reported that "[o]ne source close to the matter said there were allegations of sexual harassment against the superintendent." *See* Mary George, *Schools Chief Is Paid to Leave*, The Denver Post, Aug. 31, 1994, at 1B. The article also quoted an unnamed source as saying that the allegations of harassment "were flying around back in May." *Id.* The source continued: "We found basis for the rumors. That's why he resigned for personal reasons. I'm very glad we let him go. In order to get rid of him, that's what we had to do." *Id.* The article quoted Board President Mike Shaw as saying that he was frustrated that he could not be forthright about answering questions that people had regarding Dr. Pierce's resignation. It also attributed to one current and one former school board member comments regarding the fact that the District might face lawsuits because of Dr. Pierce's conduct.

After the publication of that article, Dr. Pierce filed this action. As relevant to this appeal, Dr. Pierce contended that the settlement agreement he entered into with the District was a valid and enforceable contract, and that the District and individual Board members breached that contract by making the public statements reported in the article.

The District and the individual Board members moved for summary judgment, arguing that the statements attributed to Board President Mike Shaw did not violate the agreement; that the District could not be liable for other comments that were made by people who were not parties to the agreement; and that the portion of the agreement

prohibiting disparaging statements was unenforceable because it violated public policy. The trial court granted summary judgment in favor of the District and the Board members.

The court of appeals affirmed, concluding that the provisions of the agreement prohibiting comment on the circumstances surrounding Dr. Pierce's resignation and forbidding disparaging comments were void because they violated public policy as expressed in Colorado Constitution article II, section 10, and in the Open Records Act, sections 24–72–101 to –402, 7 C.R.S. (1998). *See Pierce*, 944 P.2d at 651. We now reverse.

## II.

This case comes to us in an unusual posture. We are neither dealing with a request by the news media for access to information that they contend should be available to the public, nor addressing a claim against a non-Board member District employee who did not sign the agreement but who is nevertheless being sued for speaking freely about what he or she knew. Rather, we are being asked to determine whether the parties to a contract may escape its terms upon some later assertion that they never should have entered into the agreement at all because it was contrary to the First Amendment or to the public interest.

Fundamentally, then, this is a contract case. We must decide whether the contract between these parties is enforceable as written, or whether constitutional or public policy concerns render it unenforceable.

## A.

The agreement provided that the circumstances surrounding Dr. Pierce's resignation would remain confidential and that neither party would make disparaging public remarks.[4] Specifically, the District and the Board members promised that they would not reveal anything about the sexual harass-

---

4. The District and the Board members suggest that Dr. Pierce failed to properly raise the issue of the confidentiality provisions before the trial court. We find, however, that the factual allega-tions of the complaint sufficiently raised the issue and the court of appeals discussed it. Therefore, we proceed to address the issue.

ment allegations against Dr. Pierce or make comments inconsistent with the announcement that Dr. Pierce was resigning for personal reasons.

The parties do not dispute that the agreement satisfied the basic elements of contract formation. It specifically identified the consideration for which the parties bargained, and the parties' signatures indicated their mutual assent to those terms. *See I.M.A., Inc. v. Rocky Mountain Airways*, 713 P.2d 882, 888 (Colo.1986); Restatement (Second) of Contracts § 17(1) (1981) ("[T]he formation of a contract requires a bargain in which there is a manifestation of mutual assent to the exchange and a consideration."). In addition, we note that both parties had the benefit of representation by counsel, who presumably offered advice as to the ramifications of the agreement. We thus begin from the presumption that this was a valid and legally enforceable contract. We must next determine whether some countervailing concern dictates that parties to a presumptively valid agreement like the one at issue may not legally bind themselves in such a manner.

### B.

As a threshold matter, the Board members argue that because these provisions restricted the parties' freedom of speech, the agreement is unenforceable as violative of the First Amendment.[5] Essentially, the Board members argue that they could not legally have given up their right to speak freely about the terms of the agreement, the underlying circumstances, and their opinions of Dr. Pierce. We reject this contention.

The Board members rely heavily on the notion that the agreement impinges upon their free speech rights to comment on a matter of public concern. Indeed, it does, but only by operation of the specific provisions of a contract to which they agreed.

Most frequently, the protections of the First Amendment are invoked in circumstances that have little relationship to contract law. For example, in *Pickering v. Board of Education*, a teacher was dismissed from his position for authoring and sending a letter to the local newspaper critical of the local school board's allocation and use of funds. *See Pickering v. Board of Educ.*, 391 U.S. 563, 564–65, 88 S.Ct. 1731, 20 L.Ed.2d 811 (1968). The Court held that statements on matters of public concern must be accorded First Amendment protection, and that under the facts of that case, the teacher's exercise of his right to speak on those issues could not furnish the basis for his dismissal. *See id.* at 574, 88 S.Ct. 1731. Certainly in *Pickering*, the teacher did not contract to limit his right to speak about a particular issue in exchange for some consideration to him.

The only case in which the Supreme Court has specifically addressed the interrelationship between contract law or quasi-contract law and the First Amendment is *Cohen v. Cowles Media Co.*, 501 U.S. 663, 669, 111 S.Ct. 2513, 115 L.Ed.2d 586 (1991). In *Cohen*, the Court addressed a situation in which a prominent political figure named Dan Cohen offered, on the condition of confidentiality, to provide local newspapers with damaging information regarding a candidate of a rival political party. Despite the promise of confidentiality, the newspapers published Cohen's name as the source of the damaging information. Cohen was fired by his employer on the day that the stories appeared, and as a result, he sued the publishers of the newspapers.[6]

---

**5.** The First Amendment is applicable to this situation because political subdivisions of the State of Colorado, i.e., the St. Vrain Valley School District and its Board of Education, are parties to this contract, and therefore the contract implicates state action. *See Bagby v. School Dist. No. 1*, 186 Colo. 428, 435, 528 P.2d 1299, 1302 (1974) ("[S]chool districts and the boards which run them are considered to be political subdivisions of the state."). Such state action triggers the protections of the First Amendment as they apply to the states through the Fourteenth

Amendment. *See, e.g., Lovell v. City of Griffin*, 303 U.S. 444, 450, 58 S.Ct. 666, 82 L.Ed. 949 (1938).

**6.** Cohen sued the publishers of the newspapers for fraudulent misrepresentation and breach of contract. The Minnesota Supreme Court rejected Cohen's claims, and held that if Cohen could recover at all, it would be on the theory of promissory estoppel. *See Cohen v. Cowles Media Co.*, 457 N.W.2d 199, 205 (Minn.1990). The court then considered the promissory estoppel

**604**

The Supreme Court held that the First Amendment did not bar Cohen from recovering on a theory of promissory estoppel for the damages he suffered as a result of the newspapers' broken promises, regardless of the incidental effect of enforcing the promise on the First Amendment rights of the newspapers. *See Cohen,* 501 U.S. at 670–71, 111 S.Ct. 2513. The Court reasoned that "generally applicable laws do not offend the First Amendment simply because their enforcement against the press has incidental effects on its ability to gather and report the news." *Id.* at 669, 111 S.Ct. 2513.

The same reasoning applies here. Colorado contract law, like the Minnesota doctrine of promissory estoppel, is law of general applicability. Here, the parties imposed their own restrictions on their ability to speak publicly about the circumstances surrounding Dr. Pierce's resignation. Enforcement of the settlement agreement does not violate the First Amendment, but merely applies the law of contract in Colorado, which "simply requires those making promises to keep them." *Cohen,* 501 U.S. at 671, 111 S.Ct. 2513.

### C.

Having determined that the agreement survives constitutional scrutiny, we now consider the argument that the provisions are nonetheless unenforceable as violative of public policy. The District and the Board members contend that the provisions at issue in the agreement contravene the public policy interest favoring open access to information. Dr. Pierce, on the other hand, argues that the state's interest in the effective operation of government mandates that confidentiality provisions such as these be enforced.

■ It is well-established that contracts in contravention of public policy are void and unenforceable. *See, e.g., Potter v. Swinehart,* 117 Colo. 23, 27, 184 P.2d 149, 151 (1947); *Waddell v. Traylor,* 99 Colo. 576, 580, 64 P.2d 1273, 1275 (1937); *Metropolitan Life Ins. Co. v. Roma,* 97 Colo. 493, 495, 50 P.2d

1142, 1143 (1935); *Russell v. Courier Printing & Publ'g Co.,* 43 Colo. 321, 325, 95 P. 936, 938 (1908); *Oliver v. Wilder,* 27 Colo.App. 337, 343–44, 149 P. 275, 277 (1915). "[T]he difficulty arises in determining whether a given contract comes within this rule." *Russell,* 43 Colo. at 325, 95 P. at 938.

Here, in the absence of specific legislative direction to the contrary, we agree with Dr. Pierce that the agreement in this case did not contravene the public policy of Colorado. We conclude that the District and the Board members had the discretion to elevate the public policy favoring the effective operation of the school system and the confidentiality of sexual harassment allegations over the public interest in full disclosure of the circumstances surrounding Dr. Pierce's resignation.

In analyzing these public policy concerns, we look to two sources: first, general laws concerning the operation of boards of education; and second, the Open Records Act, which sets out legislative direction concerning the governmental records that are to be open to public scrutiny.

### 1.

■ Boards of education are vested with broad power to supervise public schools. *See* Colo. Const. art. IX, §§ 1, 15; § 22–32–109, 7 C.R.S. (1998). School boards "have the responsibility of implementing and carrying out the educational programs of their respective communities and must have authority adequate to enable them to discharge that responsibility." *Blair v. Lovett,* 196 Colo. 118, 124, 582 P.2d 668, 672–73 (1978); *see also Board of Educ. v. Wilder,* 960 P.2d 695, 699 (Colo.1998) (noting that local school authorities have broad discretion in operating schools).

■ In entering into the settlement agreement with Dr. Pierce, the District and the Board acted in a manner consistent with legitimate governmental interests and administrative responsibilities. *See Weissman v. Board of Educ.,* 190 Colo. 414, 421, 547 P.2d

issue, and concluded that "in this case enforcement of the promise of confidentiality under a promissory estoppel theory would violate [the newspapers'] First Amendment rights." *Id., quoted in Cohen,* 501 U.S. at 667, 111 S.Ct. 2513.

1267, 1273 (1976) (identifying the state's legitimate interest in protecting the school community from harm). Under the circumstances in this case, the Board could reasonably have decided that it was in the District's best interests to forego the opportunity to discuss the circumstances of Dr. Pierce's resignation publicly in exchange for his immediate resignation. The Board chose to resolve the problem at hand prior to the beginning of the school year, in a manner designed to minimize the disruption and expenditures that might have resulted from protracted litigation over the allegations against Dr. Pierce or Dr. Pierce's allegations of discrimination against the school board. We defer to the Board's judgment regarding how best to effectuate the interests of the school system. *Cf. Snyder v. Jefferson County Sch. Dist. R–1*, 842 P.2d 624, 631 (Colo.1992) ("[A] reviewing court may not freely substitute its judgment for a school board's appraisal of the harm inflicted on the school community by particular instances of teacher conduct.").

Certainly, then, there is nothing in our general laws conveying powers to school boards that would preclude this Board from entering into a settlement agreement such as the one with Dr. Pierce.

### 2.

We turn next to an examination of the legislative direction concerning open access to records in Colorado. This policy is grounded in fundamental principles honoring open discussion of matters of public concern. *See, e.g., New York Times Co. v. Sullivan*, 376 U.S. 254, 270, 84 S.Ct. 710, 11 L.Ed.2d 686 (1964) (noting the "profound national commitment to the principle that debate on public issues should be uninhibited, robust, and wide-open"). Indeed, as a means of furthering that interest, "[i]t is clear that the courts of this country recognize a general right to inspect and copy public records." *Nixon v. Warner Communications, Inc.*, 435 U.S. 589, 597, 98 S.Ct. 1306, 55 L.Ed.2d 570 (1978).

This general philosophy of open access to government and to governmental records is codified in Colorado, and it is that law to which we look for guidance in determining whether public policy requires that the settlement agreement with Dr. Pierce be unenforceable. The Open Records Act (Act), sections 24–72–101 to—402, 7 C.R.S. (1998), declares that the public policy of Colorado is "that all public records shall be open for inspection" unless an exception is specifically provided by law. § 24–72–201, 7 C.R.S. (1998); *see also* § 24–72–203(1)(a), 7 C.R.S. (1998).

■ The District and the Board members argue that the settlement agreement at issue is a public record to which no exception applies. The court of appeals agreed with that contention, and accordingly found that the parties' promise to keep the terms of that agreement confidential contravened the public policies expressed in the Act. We disagree.

At the time the parties entered into this settlement agreement, the Open Records Act defined "public records" as: "all writings made, maintained, or kept by the state or any agency, institution, or political subdivision thereof for use in the exercise of functions required or authorized by law or administrative rule or involving the receipt or expenditure of public funds." § 24–72–202(6), 10B C.R.S. (1988). Under the Act, all of these items are subject to public inspection unless a specific statutory provision dictates otherwise. *See* § 24–72–204(1), 7 C.R.S. (1998).

Such an exception exists for personnel files. *See* § –24–72–204(3)(a)(II)(A), 7 C.R.S. (1998) (providing that the custodian of public records shall deny the right of inspection of personnel files). However, this exception does not shield "any amount paid or benefit provided incident to termination of employment." § 24–72–202(4.5), 7 C.R.S. (1998); *see also* § 24–72–204(3)(a)(II)(B), 7 C.R.S. (1998). Therefore, the amount of the sums paid to Dr. Pierce was mandatorily disclosable, although other parts of the agreement might have been excepted from inspection if they were considered to be part of a personnel file.

In addition, the agreement might have been protected from inspection if its custodian determined that disclosure of the terms of

the agreement would do "substantial injury to the public interest." § 24–72–204(6)(a), 7 C.R.S. (1998). *But cf. Denver Publ'g Co. v. University of Colo.*, 812 P.2d 682, 685 (Colo. App.1990) (concluding that the public's right to know how public funds are expended is paramount to a university's interest in resolving internal matters of dispute).

Furthermore, section 24–72–204(3)(a)(X)(A) protects from inspection "[a]ny records of sexual harassment complaints and investigations which are maintained pursuant to any rule of the general assembly on a sexual harassment policy." § 24–72–204(3)(a)(X)(A), 7 C.R.S. (1998). The record in this case contains no information as to whether the District's actions were undertaken in accordance with a rule of the general assembly on a sexual harassment policy. However, the statutory section clearly evidences the intent of the legislature to treat matters concerning sexual harassment allegations and investigations with discretion and care.

7. Our conclusion here does not resolve the question of whether the District would be required to disclose the contents of the agreement in the face of an Open Records Act request from a third party. We only conclude that, as between these parties, the agreement is not so plainly a public record that a promise to keep its terms confidential would be unenforceable as contrary to the public policy expressed in the Act.

8. We likewise reject the argument that the public policy embodied in article II, section 10 of the Colorado Constitution precludes enforcement of the confidentiality provisions. We have held that the Colorado Constitution is more protective of the right to free expression than the First Amendment to the United States Constitution. *See, e.g., Bock v. Westminster Mall Co.*, 819 P.2d 55, 59 (Colo.1991). None of our decisions interpreting article II, section 10, however, suggests that the policy of securing a "full and free discussion of public affairs," *Cooper v. People*, 13 Colo. 337, 362, 22 P. 790, 798 (1889), *quoted in People v. Ford*, 773 P.2d 1059, 1066 (Colo.1989), *quoted in Bock*, 819 P.2d at 58, can never yield to other policy interests, such as basic contract law and such as the District's interest in this case of protecting the school community by keeping confidential its agreement with Dr. Pierce.

9. We recognize that other jurisdictions have found similar contracts to be unenforceable as against public policy. *See, e.g., Anchorage Sch. Dist. v. Anchorage Daily News*, 779 P.2d 1191,

In sum, we find nothing in the Open Records Act that would cause us to conclude that the General Assembly intended that this sort of information should always be disclosed. Rather, we find expressions of concern regarding such matters that dictate caution in analyzing application of the right to public inspection under such circumstances. From that indeterminate expression of legislative concern, we do not conclude that the terms of the settlement agreement at issue here are unenforceable as clearly violative of public policy.[7]

■■■ Thus, nothing in the expressions of public policy in the law concerning the operation of school boards and in the Open Records Act conclusively directs that the terms of this settlement agreement between an outgoing school superintendent and a school district, which allude to unadjudicated allegations of sexual harassment against the superintendent, must categorically be subject to public inspection.[8] Accordingly, we reverse the holding of the court of appeals that the agreement was unenforceable as against public policy.[9]

1193 (Alaska 1989); *Picton v. Anderson Union High Sch. Dist.*, 50 Cal.App.4th 726, 57 Cal. Rptr.2d 829, 833 (1996); *see also State ex rel. Sun Newspapers v. Westlake Bd. of Educ.*, 76 Ohio App.3d 170, 601 N.E.2d 173, 175 (1991) (noting that "[a] public entity cannot enter into enforceable promises of confidentiality with respect to public records"); *Journal/Sentinel, Inc. v. School Bd.*, 186 Wis.2d 443, 521 N.W.2d 165, 172 (Ct. App.1994) (holding that "the presumption that public records ... are open to the public is not outweighed by whatever benefits may have accrued to the public" as the result of a confidentiality agreement regarding the truncated tenure of a school district superintendent).

We note however, that those courts have been guided by statutes or regulations containing unambiguous indications of public policy regarding the pertinent issues, which is not the case here. In *Picton*, for example, the California Court of Appeal held unenforceable as against public policy a contract in which a high school agreed to keep confidential allegations of improper misconduct against a teacher. *See Picton*, 57 Cal. Rptr.2d at 833. The court's application of public policy was guided by a regulation mandating that school officials notify the Committee of Credentials of the facts that constituted the cause for the high school's disciplinary action against the teacher. *See id.; see also Anchorage Sch. Dist.*, 779 P.2d at 1193 ("The people of this state, through their elected representatives, have stated in the clearest of terms that it is more important

Here, although they now argue to the contrary, the members of the Board clearly concluded at the time they entered into the agreement that the public interests in the efficient administration of the school system outweighed considerations regarding the accessibility of this information to the public. We find no basis upon which to overturn that decision.

### III.

Thus, we hold that the confidentiality provisions of this agreement are enforceable against the parties to the agreement. We therefore reverse the decision of the court of appeals and remand this case for further proceedings.

Justice SCOTT does not participate.

that they have access to this type of information than that it remain confidential.'') (emphasis