NICHOLAS PERRICONE *v.* MADELEINE PERRICONE
(SC 17683)

Rogers, C. J., and Norcott, Katz, Palmer and Zarella, Js.

Argued January 15—officially released June 23, 2009

*Anne C. Dranginis* and *Proloy K. Das*, with whom, on the brief, was *Shannon C. Kief*, for the appellant (defendant).

*Daniel J. Krisch*, with whom were *Wesley W. Horton*, *Jean L. Welty*, and, on the brief, *Kimberly A. Knox*, for the appellee (plaintiff).

*Opinion*

ROGERS, C. J. This appeal arises from a postdissolution proceeding to enforce a confidentiality agreement

between the defendant, Madeleine Perricone, and the plaintiff, Nicholas Perricone. The defendant appeals[1] from the order of the trial court enforcing the confidentiality agreement and restraining her from disseminating any information pertaining to her divorce from the plaintiff or any derogatory or defamatory information about the parties. The defendant claims that: (1) the parties' separation agreement was fully integrated and, therefore, it nullified the confidentiality agreement; (2) even if the confidentiality agreement was not nullified, the trial court's order constitutes an unconstitutional prior restraint on her freedom of speech in violation of the first amendment to the United States constitution;[2] (3) even if the order does not violate the first amendment, it violates article first, §§ 4 and 5, of the constitution of Connecticut;[3] (4) the confidentiality agreement is void as violating public policy; and (5) the confidentiality agreement is void for indefiniteness. We affirm the judgment of the trial court.

The trial court found the following facts. The plaintiff brought the underlying action to dissolve his marriage to the defendant in September, 2003. In November, 2003, the parties entered into a confidentiality agreement pertaining to the production of discovery material and dissemination "of any information related to this litigation or . . . obtained during pretrial discovery . . . ." The

---

[1] The defendant appealed from the judgment of the trial court to the Appellate Court, and we transferred the appeal to this court pursuant to General Statutes § 51-199 (c) and Practice Book § 65-1.

[2] The first amendment to the United States constitution, which is made applicable to the states through the due process clause of the fourteenth amendment; see, e.g., *44 Liquormart, Inc.* v. *Rhode Island,* 517 U.S. 484, 489 n.1, 116 S. Ct. 1495, 134 L. Ed. 2d 711 (1996); provides in relevant part: "Congress shall make no law . . . abridging the freedom of speech . . . ."

[3] Article first, § 4, of the constitution of Connecticut provides: "Every citizen may freely speak, write and publish his sentiments on all subjects, being responsible for the abuse of that liberty."

Article first, § 5, of the constitution of Connecticut provides: "No law shall ever be passed to curtail or restrain the liberty of speech or of the press."

confidentiality agreement provided that both parties "fully understand that the plaintiff and his business interests may be severely harmed by the public dissemination of defamatory or disparaging information related to the parties. Accordingly, neither [of] the parties . . . shall disseminate or cause to be disseminated to the public and the press any such disparaging or defamatory information." The confidentiality agreement further provided that "[t]he terms of this [a]greement shall survive the entry of judgment in the dissolution of marriage action or the settlement or withdrawal of the dissolution action." The trial court, *Kenefick, J.*, approved the confidentiality agreement and made it an order of the court.

When the parties' marriage was dissolved in September, 2004, the judgment of dissolution incorporated the parties' written separation agreement, which provided that "it is the intention and desire of the parties that there be a complete, final and effective settlement of their respective rights and holdings, and that provision be made for the support of the [defendant] and minor children, custody and visitation of the minor children, as well as relinquishment of all rights, interest and claims, which one party might have upon the property of the other . . . ." It further provided that "[t]he [plaintiff] and [the defendant] have incorporated in this [a]greement their entire understanding and no oral statement or prior written matter extrinsic to this [a]greement shall have any force or effect . . . . This [a]greement supersedes any and all prior agreements between the [plaintiff] and [the defendant]."[4]

---

[4] The separation agreement contained seventeen separate articles with the following headings: (1) "Separate Ways"; (2) "Custody"; (3) "Alimony"; (4) "Child Support"; (5) "Real Property"; (6) "Lump Sum Property Settlement"; (7) "Certain Tangible Personal Property"; (8) "Other Property"; (9) "Counsel Fees"; (10) "Medical Expenses and Benefits"; (11) "Taxes"; (12) "Debts"; (13) "Legal Counsel"; (14) "Mutual Releases"; (15) "Decree and Binding Effect"; (16) "After-Documents"; and (17) "Miscellaneous Provisions."

On December 1, 2005, the plaintiff filed a motion for a restraining order alleging that he had received information that the defendant was planning to appear on a nationally broadcast television program to discuss the plaintiff, their marriage and a pending custody matter. The plaintiff sought an order prohibiting the defendant from disseminating any information about the plaintiff or the dissolution proceeding to any person. The plaintiff also requested an ex parte restraining order pending a hearing on the motion. The trial court, *Dewey, J.*, granted the ex parte restraining order and ordered a hearing the following day. That hearing was postponed due to unforeseen circumstances and the trial court, *Frazzini, J.*, ultimately conducted a hearing on December 5 and December 7, 2005.

Thereafter, the trial court issued its memorandum of decision in which it concluded that the separation agreement did not supersede and nullify the confidentiality agreement because the separation agreement and the confidentiality agreement "covered two distinct areas of the parties' rights and interests." The court stated that "[n]othing in the separation agreement shows any intent on the part of the parties to address the subjects governed by the confidentiality agreement." The court also concluded that, even if the separation agreement nullified the confidentiality agreement, it could not nullify the court order embodying the confidentiality agreement. Rather, that order could be nullified only by another court order. The court rejected the defendant's argument that its enforcement of the confidentiality agreement would violate her first amendment right to free speech because she had cited no authority for the proposition that "parties may not waive their constitutional rights and agree to impose on themselves certain restrictions of those rights or that a court may not enter an order adopting those restrictions." Accordingly, the court ordered the

defendant to cease and desist from "disseminating to the media or to any person, other than to her counsel in this litigation or to others duly authorized by the [c]onfidentiality [a]greement, the protective order, or further court order (i) any information pertaining to the dissolution action between the parties or to post-judgment proceedings between them, (ii) any 'discovery material' or 'confidential discovery material,' as those terms are defined in the confidentiality agreement and protective order of November 3, 2003, or (iii) any derogatory or defamatory information about the parties . . . ." The court further ordered the defendant to cease and desist "[f]rom appearing on radio or television for such purposes." This appeal followed.

## I

We first address the defendant's claim that the trial court improperly determined that the separation agreement did not supersede and nullify the confidentiality agreement. The defendant contends that because the separation agreement was a completely integrated agreement, it nullified all prior agreements between the parties related to the dissolution action. She further contends that the confidentiality agreement was not enforceable as a collateral agreement outside the scope of the separation agreement because the separation agreement addressed the same subject matter as the confidentiality agreement.[5] The plaintiff concedes that

---

[5] The defendant also appears to claim that, when a contract contains a clear and unambiguous merger clause, the trial court is barred from giving effect to *any* prior agreement in the absence of evidence of unequal bargaining power, fraud, duress or violations of public policy. Any such claim merits little discussion. As we discuss in the body of this opinion, it is well settled that, when the subject matter of a prior agreement is separate and distinct from the subject matter of an integrated agreement and does not vary or contradict its terms, the prior agreement is not discharged. See *Tallmadge Bros., Inc.* v. *Iroquois Gas Transmission System, L.P.*, 252 Conn. 479, 503 n.14, 746 A.2d 1277 (2000) (proof of integrated agreement does not bar proof of "collateral oral agreement which does not vary the terms of the writing" [internal quotation marks omitted]); see also 2 Restatement (Second), Contracts § 213, comment (c), p. 130 (1981) ("[w]here the parties

the separation agreement is an integrated agreement, but contends that the confidentiality agreement was not affected by the separation agreement because the subject matter of the confidentiality agreement was separate and distinct from the subject matter of the separation agreement, and the confidentiality agreement did not contradict the separation agreement or vary its terms. We agree with the plaintiff.

The parties agree as to the legal standard to be applied in determining whether a collateral agreement is outside the scope of an integrated agreement, but disagree as to whether the confidentiality agreement met that standard. Specifically, they disagree as to whether the confidentiality agreement addressed the same subject matter as the separation agreement. This is a question of fact involving the intent of the parties that is subject to reversal only if the trial court's finding was clearly erroneous. See *Levine* v. *Massey*, 232 Conn. 272, 290, 654 A.2d 737 (1995).

"[W]hen the parties have deliberately put their engagements into writing, in such terms as import a legal obligation, without any uncertainty as to the object or extent of such engagement, it is conclusively presumed, that the whole engagement of the parties, and the extent and manner of their understanding, was reduced to writing." (Internal quotation marks omitted.) *Tallmadge Bros., Inc.* v. *Iroquois Gas Transmission System, L.P.*, 252 Conn. 479, 502, 746 A.2d 1277 (2000). Under this rule, "the unambiguous terms of a written contract containing a merger clause may not be varied or contradicted by extrinsic evidence." Id., 503.

There are, however, several exceptions to this rule. Specifically, evidence extrinsic to an integrated con-

---

have adopted a writing as a complete and exclusive statement of the terms of the agreement . . . there may still be a separate agreement between the same parties which is not affected" [citation omitted]).

tract may be introduced: "(1) to explain an ambiguity appearing in the instrument; (2) to prove a collateral oral agreement which does not vary the terms of the writing; (3) to add a missing term in a writing which indicates on its face that it does not set forth the complete agreement; or (4) to show mistake or fraud. . . . These recognized exceptions are, of course, only examples of situations where the evidence (1) does not vary or contradict the contract's terms, or (2) may be considered because the contract has been shown not to be integrated; or (3) tends to show that the contract should be defeated or altered on the equitable ground that relief can be had against any deed or contract in writing founded in mistake or fraud." (Internal quotation marks omitted.) *Palozie* v. *Palozie*, 283 Conn. 538, 548 n.8, 927 A.2d 903 (2007); see also *Tallmadge Bros., Inc.* v. *Iroquois Gas Transmission System, L.P.*, supra, 252 Conn. 503 n.14 (proof of integrated agreement does not bar proof of collateral oral agreement that does not vary terms of writing); 2 Restatement (Second), Contracts § 213 (2), p. 129 (1981) ("[a] binding completely integrated agreement discharges prior agreements to the extent that they are within its scope"); 2 Restatement (Second), supra, § 213, comment (c), p. 130 ("[w]here the parties have adopted a writing as a complete and exclusive statement of the terms of the agreement . . . there may still be a separate agreement between the same parties which is not affected" [citation omitted]); 2 E. Farnsworth, Contracts (2004) § 7.3, p. 235 ("[t]he fact that an agreement is completely integrated does not, of course, affect an attempt to show an entirely separate and distinct agreement between the same parties").

In *Shelton Yacht & Cabana Club, Inc.* v. *Suto*, 150 Conn. 251, 258, 188 A.2d 493 (1963), this court stated that, in determining whether a matter falls within the collateral agreement exception, the court must consider

"the inherent probability that parties contracting under such circumstances would or would not make the [integrated] agreement in writing and also the alleged [collateral] agreement. . . . In deciding upon this intent, the chief and most satisfactory index for the judge is found in the circumstance whether or not the particular element of the alleged extrinsic [agreement] is dealt with at all in the [integrated] writing. If it is mentioned, covered, or dealt with in [that] writing, then presumably the writing was meant to represent all of the transactions on that element; if it is not, then probably the writing was not intended to embody that element of the negotiation." (Citations omitted; internal quotation marks omitted.) See also *State Finance Corp.* v. *Ballestrini*, 111 Conn. 544, 547–48, 150 A. 700 (1930); *Connecticut Savings Bank* v. *Central Builders' Supply Co.*, 4 Conn. App. 332, 334–35, 494 A.2d 601, cert. denied, 197 Conn. 805, 499 A.2d 56 (1985).

In the present case, the defendant claims that the confidentiality agreement came within the scope of the separation agreement because the confidentiality agreement "dealt with . . . information to which the defendant was entitled . . . so that her forensic expert could value the plaintiff's business [which was] key to the ultimate resolution of the property settlement . . . contained in the separation agreement."[6] As the defendant implicitly acknowledges, however, the relevant subject matter of the separation agreement was the *division of property* between the parties, while the subject matter of the confidentiality agreement was the *disclosure of information* concerning the parties' property and the parties themselves. The scope of the restric-

---

[6] The separation agreement provided that the plaintiff would pay a lump sum to the defendant, which apparently was based on the defendant's valuation of the plaintiff's business. The separation agreement also provided that, if the plaintiff sold his business, the defendant would waive any claim to a portion of the proceeds.

tions on the disclosure of information concerning the parties or their property was not "mentioned, covered, or dealt with" in the separation agreement.[7] (Internal quotation marks omitted.) *Shelton Yacht & Cabana Club, Inc.* v. *Suto*, supra, 150 Conn. 258.

Moreover, the trial court reasonably could have found that it is highly improbable that the parties intended that, upon the division of the marital property, the confidentiality agreement would be invalid, thereby exposing the plaintiff's business immediately to the harm that the agreement was intended to prevent. It is far more likely that the defendant agreed to keep information concerning the plaintiff and his business confidential permanently in exchange for a property settlement that reflected the full value of the business, unaffected by any disclosures of negative or confidential information, and the plaintiff agreed to a property settlement based on that value in exchange for the defendant's perpetual silence.[8] We can perceive no reason why the plaintiff would agree to a property settlement based on the full, unaffected value of his business with the expectation that the defendant would be free to disclose information

[7] Article II of the separation agreement incorporated by reference a parenting plan that the parties had entered into in September, 2004. The parenting plan provided in relevant part that "[n]either party nor his agents, servants or employees, shall disparage the other party, or anyone related to or associated with the other party, in the presence of the child. The parents shall exert every reasonable effort to promote and foster feelings of love and affection between the child and the other parent. . . ." Thus, the purpose of this provision was not to prohibit the disclosure of information concerning the parties, but to protect the relationship between each party and the child.

[8] Our conclusion that the property settlement was dependent on the confidentiality agreement does not affect our conclusion that the confidentiality agreement was not within the scope of the separation agreement. A collateral agreement may be related to an integrated agreement without being within the scope of the integrated agreement. See *Shelton Yacht & Cabana Club, Inc.* v. *Suto*, supra, 150 Conn. 259–60 (although written contracts and unwritten agreements related to same general subject, evidence supported conclusion that parties intended that written contracts did not cover matters included in unwritten agreements).

that could reduce its value immediately upon executing the property settlement. Indeed, the confidentiality agreement expressly provided that it would "survive the entry of judgment in the dissolution of marriage action . . . ." We conclude, therefore, that the trial court properly determined that the confidentiality agreement was outside the scope of the separation agreement and was not affected by it.

## II

We next address the defendant's claim that the trial court's order enforcing the provisions of the confidentiality agreement prohibiting her from disseminating information about the plaintiff, her marriage to the plaintiff or the dissolution and postdissolution proceedings constituted a prior restraint on her free speech in violation of the first amendment to the United States constitution.[9] The plaintiff counters that the defendant

[9] We address the defendant's claims under article first, §§ 4 and 5, of the constitution of Connecticut in part III of this opinion.

The plaintiff contends that the defendant conceded that the confidentiality agreement constituted a waiver of her first amendment rights during the following exchange at the hearing before the trial court on the plaintiff's motion for a restraining order and permanent injunction:

"[The Defendant's Counsel]: I just want to point out when we get into the issue of constitutionality, to suppress her speech when any stranger could walk in from Church Street and look at the file, would in my opinion be unconstitutional suppression of that speech.

"The Court: Well—

"[The Defendant's Counsel]:—but getting back to Your Honor's issue.

"The Court: Can't she agree to do that? I mean, you're not making a first amendment claim, are you, that constitutional rights of the parties would override the confidentiality agreement? She's got the right to contract her—

"[The Defendant's Counsel]:—absolutely.

"The Court:—free—

"[The Defendant's Counsel]:—and she hasn't done that. So I'll get back to—

"The Court:—well, didn't she initially in the confidentiality agreement?

"[The Defendant's Counsel]: She did, but that's superseded by the divorce judgment."

In its memorandum of decision, however, the trial court expressly concluded that there was "no merit in the defendant's claim that the parties cannot, by contract, waive their first amendment rights." It is clear, therefore,

waived her free speech rights when she executed the confidentiality agreement. In turn, the defendant contends that: (1) a waiver of the first amendment's prohibition on prior restraints on speech cannot be enforced constitutionally unless it is narrowly tailored to advance a compelling state interest, and the confidentiality agreement does not satisfy that requirement; and (2) even if a waiver of first amendment rights generally can be enforced, she did not waive her first amendment rights. We conclude that the defendant validly waived her first amendment rights.

A

Whether a waiver of the first amendment's prohibition on prior restraints on speech constitutionally can be enforced is a question of law over which we exercise plenary review. See *Cambodian Buddhist Society of Connecticut, Inc.* v. *Planning & Zoning Commission*, 285 Conn. 381, 398 n.11, 941 A.2d 868 (2008) (scope of constitutional right is question of law).

The first step in our analysis is to address the threshold question of whether judicial enforcement of a private confidentiality agreement constitutes state action, thereby triggering first amendment protections. See *Cohen* v. *Cowles Media Co.*, 501 U.S. 663, 668, 111 S. Ct. 2513, 115 L. Ed. 2d 586 (1991) (in absence of state action, first amendment protections are not implicated). Although the United States Supreme Court has not directly addressed this question, it has considered the related question of whether a court's enforcement of a confidentiality agreement by way of a private cause of action for promissory estoppel implicates the first

that the trial court understood the defendant to be making a claim under the first amendment and directly addressed it. We conclude, therefore, that the defendant's claim that the confidentiality agreement violated her first amendment rights and that she could not contractually waive those rights was adequately raised and preserved for review.

amendment and has concluded that it does. Id., 665. The plaintiff in *Cohen* v. *Cowles Media Co.*, supra, 665, had provided certain information to the defendant newspapers after receiving promises of confidentiality from their reporters. Despite the promises of confidentiality, the newspapers identified the plaintiff as the source of the information. Id., 666. The plaintiff then brought an action against the newspapers for fraudulent misrepresentation and breach of contract. Id. The plaintiff ultimately prevailed on his breach of contract claim and the defendants appealed to the Minnesota Supreme Court. Id. That court concluded that the plaintiff did not have a valid cause of action for breach of contract, but he did have a claim for promissory estoppel. Id., 666–67. The court ultimately concluded that enforcement of the defendants' promises of confidentiality would violate their first amendment rights. Id., 667.

On appeal, the United States Supreme Court noted that "the Minnesota Supreme Court held that if [the plaintiff] could recover at all, it would be on the theory of promissory estoppel, a state law doctrine which, in the absence of a contract, creates obligations never explicitly assumed by the parties"; id., 668; and concluded that "[t]hese legal obligations would be enforced through the official power of the Minnesota courts. Under our cases, that is enough to constitute 'state action' for purposes of the [first amendment, which is applicable to the states through the] [f]ourteenth [a]mendment." Id.

The United States Supreme Court then concluded that the enforcement of the defendants' promise of confidentiality did not violate the first amendment because the doctrine of promissory estoppel "is generally applicable to the daily transactions of all the citizens of Minnesota." Id., 670. The court distinguished the cases in which "the [s]tate itself defined the content of publications that would trigger liability"; id.; on the ground

that "Minnesota law simply requires those making promises to keep them. The parties themselves, as in this case, determine the scope of their legal obligations, and any restrictions that may be placed on the publication of truthful information are self-imposed." Id., 671.

It is not entirely clear to us whether, for purposes of determining whether the enforcement of state law in state courts constitutes state action under the fourteenth amendment, the United States Supreme Court in *Cohen* intended to distinguish promissory estoppel actions from contract actions on the ground that the former involve "a state-law doctrine which . . . creates obligations never explicitly assumed by the parties."[10] Id., 668. We need not decide that question here,

---

[10] A number of courts have concluded that *Cohen* merely stands for the narrow proposition that, when the state *creates* a legal duty and then enforces that duty, the enforcement constitutes state action. *Cremin* v. *Merrill Lynch Pierce Fenner & Smith, Inc.*, 957 F. Sup. 1460, 1469–70 (N.D. Ill. 1997); *State* v. *Noah*, 103 Wash. App. 29, 49–50, 9 P.3d 858 (2000), review denied sub nom. *Calof* v. *Casebeer*, 143 Wash. 2d 1014, 22 P.3d 802 (2001). These courts have declined to extend *Cohen* to contract actions in which the parties knowingly and voluntarily assumed the duties that the courts then enforced. *Cremin* v. *Merrill Lynch Pierce Fenner & Smith, Inc.*, supra, 1470; *State* v. *Noah*, supra, 50. Thus, it is arguable that *Cohen* stands for the proposition that, *in the absence of an express, voluntary agreement between the parties*, a court order restraining speech constitutes state action triggering first amendment protections. See, e.g., *Trump* v. *Trump*, 179 App. Div. 2d 201, 205, 582 N.Y.S.2d 1008 ("[T]he constitutional prohibition against prior restraint applies only to orders issued by the government. In arguing that a divorce judgment incorporating the terms of a postnuptial [confidentiality] agreement is the equivalent of a governmental order, the wife takes a great leap in logic. We reject such a premise."), appeal dismissed, 80 N.Y.2d 892, 600 N.E.2d 634, 587 N.Y.S.2d 907 (1992). One commentator has concluded, however, that the distinction between the enforcement of a promise and the enforcement of a contract in this context "is dubious at best and probably false," because the defendant in a promissory estoppel action "initially create[d] his obligation by making a promise to do something." A. Garfield, "Promises of Silence: Contract Law and Freedom of Speech," 83 Cornell L. Rev. 261, 350 (1998). "The difference between a contract claim and a promissory estoppel claim is merely that in one instance a court enforces a promise because it was part of a bargain, and in the other a court enforces a promise because it induced unbargained-for reliance." Id., 351.

however, because, even if we assume that the judicial enforcement of a confidentiality agreement between private parties constitutes state action, the United States Supreme Court held in *Cohen* that private parties who voluntarily enter into an agreement to restrict their own speech thereby waive their first amendment rights.[11] See id., 671. Nothing in *Cohen* suggests that such an agreement is enforceable only if it is narrowly tailored to advance a compelling state interest.

In support of her claim that the judicial enforcement of such agreements is presumptively unconstitutional, the defendant in the present case cites numerous cases in which courts have concluded that contractual restrictions on speech are subject to strict scrutiny.[12] Her

[11] We recognize that the court in *Cohen* did not use the language of waiver. As one commentator has noted, however, the court's statement that the "law simply requires those making promises to keep them"; *Cohen* v. *Cowles Media Co.*, supra, 501 U.S. 671; "arguably suggests that a [f]irst [a]mendment violation does not occur when a defendant has waived his right to speak by making a binding commitment to be silent." A. Garfield, "Promises of Silence: Contract Law and Freedom of Speech," 83 Cornell L. Rev. 261, 355 (1998).

[12] The plaintiff also cites several federal cases in which the courts concluded that the party claiming a violation of first amendment rights had not waived those rights by agreement. None of those cases, however, involved an intelligent and voluntary agreement to restrict speech that satisfied the traditional requirements of a contractual waiver. See *Sambo's Restaurants, Inc.* v. *Ann Arbor*, 663 F.2d 686, 691 (6th Cir. 1981) (when plaintiff received no consideration for voluntary agreement not to use "Sambo's" as name of restaurant, there was no binding agreement under state contract law); *Karetnikova* v. *Trustees of Emerson College*, 725 F. Sup. 73, 76 (D. Mass. 1989) (rejecting defendant's claim that agreement to arbitrate procedural claims constituted waiver of right to litigate substantive claim that defendant had violated plaintiff's free speech rights); *Writers Guild of America, West, Inc.* v. *Federal Communications Commission*, 423 F. Sup. 1064, 1144 n.133 (C.D. Cal. 1976) (stating summarily that agreements, details of which were not specified, between television networks, whose conduct constituted state action because they were acting under government pressure, and creators, writers and producers of television programs did not constitute valid waivers of first amendment rights because "[n]o language of the contracts can fairly bear such a construction, and such contracts, in any event, would violate public policy"), vacated on other grounds by *Writers Guild of America, West, Inc.* v. *American Broadcasting Co.*, 609 F.2d 355 (9th Cir. 1979), cert.

reliance on these cases is misplaced, however, because none of the cases involves a voluntary agreement to restrict speech between private parties. Rather, the cases involve an employment agreement between a private party and a government entity,[13] actions for injunctions brought by government entities,[14] tort actions[15] or

denied, 449 U.S. 824, 101 S. Ct. 85, 66 L. Ed. 2d 27 (1980). Thus, none of these cases supports the broad proposition that first amendment rights never may be waived by agreement.

[13] See *Snepp* v. *United States*, 444 U.S. 507, 509 n.3, 100 S. Ct. 763, 62 L. Ed. 2d 704 (1980) (when Central Intelligence Agency brought action to enforce employee's agreement not to publish information relating to agency without prepublication clearance, court concluded that contract did not violate first amendment because it was justified by compelling interest); *United States* v. *Marchetti*, 466 F.2d 1309, 1313 (4th Cir.) ("the [f]irst [a]mendment limits the extent to which the United States, contractually or otherwise, may impose secrecy requirements upon its employees and enforce them with a system of prior censorship"), cert. denied, 409 U.S. 1063, 93 S. Ct. 553, 34 L. Ed. 2d 516 (1972); see also *Mansoor* v. *Trank*, 319 F.3d 133, 139 n.4 (4th Cir. 2003) (government employer cannot condition employment on waiver of first amendment rights "unless the government's interests in promoting the efficiency of the public services it performs through its employee outweigh those of the employee in commenting on matters of public concern" [internal quotation marks omitted]).

[14] See *New York Times Co.* v. *United States*, 403 U.S. 713, 714, 91 S. Ct. 2140, 29 L. Ed. 2d 822 (1971) (per curiam) (when United States brought action seeking to enjoin publication of classified study, injunction constituted prior restraint on free speech and government had heavy burden of justifying it); *In re Brianna B.*, 66 Conn. App. 695, 700, 785 A.2d 1189 (2001) (court order granting motion for order of confidentiality filed by commissioner of children and families constituted prior restraint on first amendment rights and was subject to strict scrutiny).

[15] See *Organization for a Better Austin* v. *Keefe*, 402 U.S. 415, 418–19, 91 S. Ct. 1575, 29 L. Ed. 2d 1 (1971) (when plaintiff brought action for invasion of privacy seeking to enjoin defendants from distributing leaflets critical of him, court order granting injunction constituted impermissible prior restraint on first amendment rights); *Metropolitan Opera Assn., Inc.* v. *Local 100, Hotel Employees & Restaurant Employees International Union*, 239 F.3d 172, 176–79 (2d Cir. 2001) (when plaintiff brought defamation action seeking injunction against defendant's public criticism, injunction constituted prior restraint on speech); *In re Marriage of Suggs*, 152 Wash. 2d 74, 84, 93 P.3d 161 (2004) (when husband filed petition for order for protection from unlawful harassment by former wife, court order restraining wife from speaking to third parties was unconstitutional prior restraint because it was insufficiently definite). "[T]he [United States] Supreme Court

restraining orders issued by the courts during the course of litigation without the agreement of all parties.[16]

We recognize that *Cohen* involved an action for damages, and not, as in the present case, a request for a restraining order. The defendant has not cited, however, and our research has not revealed, a single case in which a court has held that a judicial restraining order that enforces an agreement restricting speech between private parties constitutes a per se violation of the first amendment's prohibition on prior restraints on speech. We conclude, therefore, that the court's reasoning in *Cohen* is equally applicable here.[17] As numerous courts have recognized, when private parties—and not the government—voluntarily have defined the scope of the disclosures that would trigger sanctions, the parties cannot

has held that the torts of defamation, privacy, and intentional infliction of emotional distress all implicate the [f]irst [a]mendment." A. Garfield, "Promises of Silence: Contract Law and Freedom of Speech," 83 Cornell L. Rev. 261, 350 (1998), citing *Hustler Magazine, Inc.* v. *Falwell*, 485 U.S. 46, 53, 108 S. Ct. 876, 99 L. Ed. 2d 41 (1988); *Time, Inc.* v. *Hill*, 385 U.S. 374, 387–88, 87 S. Ct. 534, 17 L. Ed. 2d 456 (1967); *New York Times Co.* v. *Sullivan*, 376 U.S. 254, 265, 84 S. Ct. 710, 11 L. Ed. 2d 686 (1964). Garfield explains the distinction between tort law and contractual law in this context as follows: "The clearest difference between the two is that contractual liability is consensual in nature. Although a state creates the background rules regarding when private agreements will be enforceable, contractual obligations arise only when a party makes a promise and another party offers consideration in exchange for that promise. By contrast, courts impose tort obligations, as a matter of law, for policy reasons. The state, rather than private parties, defines the conduct that will be subject to sanction." A. Garfield, supra, 348.

[16] See *Johanson* v. *Eighth Judicial District Court*, 124 Nev. 245, 251, 182 P.3d 94 (2008) (trial court's sua sponte order preventing parties and attorneys in divorce action from disclosing any documents or discussing case constituted prior restraint on free speech subject to strict scrutiny); *Kemner* v. *Monsanto Co.*, 112 Ill. 2d 223, 242–45, 492 N.E.2d 1327 (1986) (court order prohibiting defendant from communicating with news media about case constituted prior restraint on speech subject to strict scrutiny).

[17] See *Paul* v. *Friedman*, 95 Cal. App. 4th 853, 869, 117 Cal. Rptr. 2d 82 (2002) (action for injunctive relief to enforce confidentiality agreement did not violate first amendment because defendant waived free speech rights).

complain if the court merely holds them to their promises. See *Cohen* v. *Cowles Media Co.*, supra, 501 U.S. 671; *Erie Telecommunications, Inc.* v. *Erie*, 853 F.2d 1084, 1099 (3d Cir. 1988) ("we know of no doctrine, and [the plaintiff] has directed us to no case law, providing a per se rule that constitutional claims, even first amendment claims, may not be waived" by agreement).[18] Accordingly, we conclude that a party's contractual waiver of the first amendment's prohibition on prior restraints on speech constitutionally may be enforced by the courts even if the contract is not narrowly tailored to advance a compelling state interest.

## B

We turn, therefore, to the defendant's claim that she did not, in fact, voluntarily and intelligently waive her first amendment rights by entering into the confidentiality agreement. The following additional facts and procedural history are relevant to our resolution of this claim. The trial court, *Kenefick, J.*, held an evidentiary hearing on November 3, 2003, to consider the parties' request that the court make the confidentiality agreement an

---

[18] See also *Lake James Community Volunteer Fire Dept., Inc.* v. *Burke*, 149 F.3d 277, 278 (4th Cir. 1998) (finding valid contractual waiver of first amendment rights), cert. denied, 525 U.S. 1106, 119 S. Ct. 874, 142 L. Ed. 2d 775 (1999); *Leonard* v. *Clark*, 12 F.3d 885, 889–90 (9th Cir. 1993) (same); *Paragould Cablevision, Inc.* v. *Paragould*, 930 F.2d 1310, 1315 (8th Cir.) (same), cert. denied, 502 U.S. 963, 112 S. Ct. 430, 116 L. Ed. 2d 450 (1991); *Forbes* v. *Milwaukee*, United States District Court, Docket No. 05-C-591 (E.D. Wis. January 4, 2007) (same); *Kovacs* v. *Jim*, United States District Court, Docket No. 4:03-CV-33 (W.D. Mich. July 31, 2003) (same); *Wilkicki* v. *Brady*, 882 F. Sup. 1227, 1233–34 (D.R.I. 1995) (same); *Pierce* v. *St. Vrain Valley School District*, 981 P.2d 600, 603–604 (Colo. 1999) (same); *Messina* v. *Dept. of Job Service*, 341 N.W.2d 52, 61 (Iowa 1983) (same); *Verizon New England, Inc.* v. *Public Utilities Commission*, 866 A.2d 844, 849 (Me. 2005) (same); *Trump* v. *Trump*, 179 App. Div. 2d 201, 205–206, 582 N.Y.S.2d 1008 (same), appeal dismissed, 80 N.Y.2d 892, 600 N.E.2d 634, 587 N.Y.S.2d 907 (1992); *Estate of Barber* v. *Sheriff's Dept.*, 161 N.C. App. 658, 664–65, 589 S.E.2d 433 (2003) (same); cf. *D. H. Overmyer Co.* v. *Frick Co.*, 405 U.S. 174, 184–87, 92 S. Ct. 775, 31 L. Ed. 2d 124 (1972) (party may waive by agreement due process right to notice and hearing in advance of judgment).

order of the court. During the hearing, counsel for the defendant presented the defendant with the confidentiality agreement and asked her if she had signed it and if she had discussed it with counsel. The defendant indicated that she had. When the trial court inquired whether the defendant had had enough time to review the agreement with her attorney, the defendant responded, "I would like to have more time, but I think that this is adequate, today." The trial court then asked the defendant if anyone was forcing her to enter into the agreement and she responded, "As long as there's no statement here that prejudices me against coming into court . . . in the future." The trial court then stated, "you're okay with the agreement for now," and the defendant responded, "Exactly." Counsel for the defendant then summarized the terms of the agreement,[19] and the trial court asked the defendant if that was her understanding. She responded, "Yes."

The defendant now contends that, "[b]ecause the record does not clearly show that [she] was made aware that she had a first amendment right to free speech

[19] The defendant's counsel stated: "[W]e're agreeing . . . without prejudice in this confidentiality agreement [that] there are two categories of materials, discovery material and what's referred to as confidential discovery material; and we have agreed that those materials will not be disclosed other than to counsel or to people employed by counsel, including their staff, during the term of this proceeding.

"There's also some provisions for certain sections of this confidentiality agreement surviving this litigation and entry of judgment.

"We've also agreed that we are going to request the court at some point in the future to seal certain records that are of a confidential business nature when they are submitted, and we will do that by agreement.

"We've also agreed that neither party will talk to the press or give any public information regarding this litigation at this point in time; and we also agreed that it is our firm intent at this juncture to make sure that nothing harmful is done to anybody's economic interests or to the interests of the minor child as they may be directly or indirectly related to the overall economic interests of the parties or in any way cause any information to be broadcast or publicized that may result in negative consequences for the parties or their minor child."

and that, by signing the 2003 agreement, she would be waiving that right, she cannot be said to have waived that constitutional right." The plaintiff contends that, as long as the defendant knew the substance of the restrictions that the confidentiality agreement placed on her speech and voluntarily agreed to them, there was no requirement that she be expressly informed that the confidentiality agreement limited her first amendment rights. We agree with the plaintiff.

"[A] waiver is ordinarily an intentional relinquishment or abandonment of a known right or privilege. An effective waiver presupposes full knowledge of the right or privilege allegedly [being] waived and some act done designedly or knowingly to relinquish it. . . . Moreover, the waiver must be accomplished with sufficient awareness of the relevant circumstances and likely consequences." (Citations omitted; internal quotation marks omitted.) *State* v. *Santiago*, 245 Conn. 301, 310–11, 715 A.2d 1 (1998).

This court has not previously considered the question of who has the burden of proving a contractual waiver of first amendment rights. In criminal cases, it is well established that the court must "indulge every reasonable presumption against waiver of fundamental constitutional rights. . . . For that reason, it is the [s]tate that has the burden of establishing a valid waiver." (Citation omitted; internal quotation marks omitted.) *State* v. *Piorkowski*, 243 Conn. 205, 230, 700 A.2d 1146 (1997). In *L & R Realty* v. *Connecticut National Bank*, 246 Conn. 1, 16, 715 A.2d 748 (1998), however, this court held that, "in accordance with our public policy favoring freedom of contract and the efficient resolution of disputes . . . express commercial contractual jury trial waivers entered into prior to litigation are presumptively enforceable . . . [and] the party seeking to avoid the waiver carries the burden of proving, by a prepon-

derance of the evidence, the lack of a clear intent to be bound by the waiver provision." (Citations omitted.)

We conclude that the public policy favoring freedom of contract and efficient resolution of disputes applies equally to contractual waivers of first amendment rights.[20] Accordingly, we conclude that these waivers also are presumptively enforceable, and the burden of proving their invalidity is on the party seeking to avoid the waiver. "The determination of whether there has been an intelligent waiver . . . depend[s], in each case, upon the particular facts and circumstances surrounding that case, including the background, experience, and conduct of the [waiving party]." *Johnson* v. *Zerbst*, 304 U.S. 458, 464, 58 S. Ct. 1019, 82 L. Ed. 1461 (1938); see also *Erie Telecommunications, Inc.* v. *Erie*, supra, 853 F.2d 1095 (applying *Johnson* standard in case involving contractual waiver of first amendment rights).

"The standard by which the trial court determines the validity of a [contractual waiver of a constitutional right] is a question of law that is subject to de novo review. . . . Once that standard has been established, [w]hether a party has waived [a constitutional right]

---

[20] We stated in *L & R Realty* that "[w]hen jury trial waiver agreements are entered into in the context of contract negotiations, there is a far greater likelihood that the waiver was agreed to as part of a mutually beneficial contractual arrangement and far less danger of overreaching and duress by the party seeking to enforce the waiver." *L & R Realty* v. *Connecticut National Bank*, supra, 246 Conn. 14. We recognize that, unlike a jury trial waiver, the consequences of a waiver of first amendment rights may vary widely from case to case. The waiver may involve a minor restriction on relatively unimportant speech or a broad restriction on speech about matters of great public concern. Accordingly, as we discuss in part IV of this opinion, a contract that has the effect of restricting speech that was entered into intelligently and voluntarily and, therefore, ordinarily would be enforceable under the public policy favoring freedom of contract, may nevertheless be void as violating the public policy favoring the free exchange of information. The first step in our analysis, however, is to determine whether the contractual waiver was intelligent and voluntary. In making that determination, the public policy favoring freedom of contract directs us to presume that it was.

presents a question of fact for the trial court [and our review is limited to whether the finding was clearly erroneous]. . . . A finding is clearly erroneous when although there is evidence to support it, the reviewing court on the entire evidence is left with the definite and firm conviction that a mistake has been committed." (Citations omitted; internal quotation marks omitted.) *L & R Realty* v. *Connecticut National Bank*, supra, 246 Conn. 8–9.

As we have indicated, the United States Supreme Court in *Cohen* v. *Cowles Media Co.*, supra, 501 U.S. 671, implicitly held that a person's voluntary promise to keep information confidential constitutes a valid waiver of first amendment rights, even though nothing in that case suggested that the defendants were expressly aware that their promise to keep the plaintiff's identity confidential had restricted speech rights protected by the first amendment. Numerous courts have explicitly reached the same conclusion. In *Erie Telecommunications, Inc.* v. *Erie*, supra, 853 F.2d 1096, for example, the United States Court of Appeals for the Third Circuit concluded that a party may waive first amendment rights by contract "where the parties to the contract have bargaining equality and have negotiated the terms of the contract, and where the waiving party is advised by competent counsel and has engaged in other contract negotiations." See also *Leonard* v. *Clark*, 12 F.3d 885, 889–90 (9th Cir. 1993) (waiver of first amendment rights was knowing, voluntary and intelligent when: [1] party was advised by competent counsel; [2] party proposed language that it objected to; [3] party voluntarily signed agreement; and [4] parties were of relatively equal bargaining strength);[21] cf. *D. H. Over-*

---

[21] See also *Pierce* v. *St. Vrain Valley School District*, 981 P.2d 600, 603–604 (Colo. 1999) (confidentiality provision of settlement agreement that did not expressly mention first amendment rights constituted valid waiver of first amendment rights); *Verizon New England, Inc.* v. *Public Utilities Commission*, 866 A.2d 844, 849 (Me. 2005) ("[a]lthough [the plaintiff's] stipulation contained no express waiver, by agreeing to the restriction, [the plaintiff]

*myer Co.* v. *Frick Co.*, 405 U.S. 174, 188, 92 S. Ct. 775, 31 L. Ed. 2d 124 (1972) (in determining validity of contractual waiver of due process right to notice and hearing in advance of judgment court considers whether contract is one of adhesion, whether there is disparity in bargaining power and whether party waiving right received consideration for waiver); *L & R Realty* v. *Connecticut National Bank*, supra, 246 Conn. 15 (in determining validity of contractual waiver of constitutional right to jury trial, court considers: "[2] whether there was a substantial disparity in bargaining power between the parties to the agreement; [3] whether the party seeking to avoid enforcement was represented by counsel; [4] whether the . . . party had an opportunity to negotiate the terms of the agreement; and [5] whether the . . . party had been fraudulently induced into agreeing specifically to the jury trial waiver").

We are persuaded by the weight of authority that an agreement that restricts speech, but that does not expressly refer to first amendment rights, constitutes a valid waiver of those rights, as long as the waiver was intelligent and voluntary. As these cases recognize, when an agreement clearly sets forth the restrictions on constitutionally protected speech, the talismanic recital of the words "first amendment" would not add materially to the party's understanding of the right being waived.[22] We also conclude that, in determining whether a waiver of first amendment rights was intelligent and voluntary, the court should consider whether the parties to the contract had relative bargaining equality,

did clearly relinquish its right to bring a [f]irst [a]mendment challenge during the period that the order was in effect"); *Estate of Barber* v. *Sheriff's Dept.*, 161 N.C. App. 658, 664–65, 589 S.E.2d 433 (2003) (nondisparagement provision of settlement agreement that did not mention first amendment constituted valid waiver of first amendment rights).

[22] Indeed, although we have assumed for the purposes of this opinion that an agreement between private parties to restrict speech implicates the first amendment, that is, as we have indicated, an open question.

whether they negotiated the terms of the contract, whether the party seeking to avoid the waiver was advised by competent counsel and the extent to which that party has benefited from the agreement. Although there is no requirement that the agreement expressly refer to first amendment rights, the court should also consider whether the contractual provision restricting speech was conspicuous. Cf. *L & R Realty* v. *Connecticut National Bank*, supra, 246 Conn. 15 (in determining validity of waiver of jury trial, court should consider: "[1] the conspicuousness of the waiver clause, including [a] its location relative to the signatures of the parties, [b] whether it was buried in the middle of a lengthy agreement, and [c] whether it was printed in a different typeface or font size than the remainder of the contract").

In the present case, there is no dispute that the defendant and the plaintiff had relative bargaining equality during the dissolution proceedings—they negotiated the terms of the confidentiality contract, and the defendant, who was represented by competent counsel, voluntarily signed the confidentiality agreement and significantly benefited from it.[23] In addition, the clear and unambiguous purpose of the entire confidentiality agreement was to restrict the parties' speech. Accordingly, we conclude that the trial court properly found that the defendant intelligently and voluntarily had waived her first amendment rights.

## III

We next address the defendant's claim that, even if she waived her first amendment rights by agreement,

---

[23] As we have indicated, a primary purpose of the confidentiality agreement was to protect the value of the plaintiff's business which, in turn, provided the basis for the property settlement. Presumably, the defendant would have received a less favorable settlement in the absence of the agreement to reflect the greater risk to the value of the plaintiff's business. In addition to this benefit, the defendant received assurance that the plaintiff would not disparage her to others.

the trial court's order enforcing the confidentiality agreement violates article first, §§ 4 and 5, of the constitution of Connecticut because the rights guaranteed therein cannot be waived.[24] We disagree.

At the outset, we set forth the standard of review. Whether the state constitution precludes a contractual waiver of constitutionally protected speech rights is a question of law over which our review is plenary. See *Cambodian Buddhist Society of Connecticut, Inc.* v. *Planning & Zoning Commission,* supra, 285 Conn. 398 n.11.

"It is well established that federal constitutional and statutory law establishes a minimum national standard for the exercise of individual rights and does not inhibit state governments from affording higher levels of protection for such rights. . . . Furthermore, although we often rely on the United States Supreme Court's interpretation of the amendments to the constitution of the United States to delineate the boundaries of the protections provided by the constitution of Connecticut, we have also recognized that, in some instances, our state

---

[24] The defendant requests review of her claim under the state constitution pursuant to *State* v. *Golding,* 213 Conn. 233, 239–40, 567 A.2d 823 (1989). Under *Golding,* "a defendant can prevail on a claim of constitutional error not preserved at trial only if *all* of the following conditions are met: (1) the record is adequate to review the alleged claim of error; (2) the claim is of constitutional magnitude alleging the violation of a fundamental right; (3) the alleged constitutional violation clearly exists and clearly deprived the defendant of a fair trial; and (4) if subject to harmless error analysis, the state has failed to demonstrate harmlessness of the alleged constitutional violation beyond a reasonable doubt." (Emphasis in original.) Id. "The test set forth in *Golding* applies in civil as well as criminal cases." *Chatterjee* v. *Commissioner of Revenue Services,* 277 Conn. 681, 694 n.15, 894 A.2d 919 (2006). Because the defendant's claim is of constitutional magnitude and the record is adequate for review, we review the claim. The defendant cannot prevail on her constitutional claim, however, under the third prong of *Golding.*

In reviewing the defendant's claim under the state constitution, we again assume, without deciding, that judicial enforcement of a contract between private parties constitutes state action.

constitution provides protections beyond those provided by the federal constitution, as that document has been interpreted by the United States Supreme Court. . . . The analytical framework by which we determine whether, in any given instance, our state constitution affords broader protection to our citizens than the federal constitutional minimum is well settled. In *State* v. *Geisler,* [222 Conn. 672, 684–86, 610 A.2d 1225 (1992)], we enumerated the following six factors to be considered in determining that issue: (1) persuasive relevant federal precedents; (2) the text of the operative constitutional provisions; (3) historical insights into the intent of our constitutional forebears; (4) related Connecticut precedents; (5) persuasive precedents of other state courts; and (6) contemporary understandings of applicable economic and sociological norms, or as otherwise described, relevant public policies." (Citations omitted; internal quotation marks omitted.) *State* v. *Ledbetter,* 275 Conn. 534, 560–61, 881 A.2d 290 (2005), cert. denied, 547 U.S. 1082, 126 S. Ct. 1798, 164 L. Ed. 2d 537 (2006).

We address each consideration in turn. With regard to relevant federal precedents, we conclude that they militate against the defendant's position. As we explained in part II of this opinion, the great weight of federal authority supports the conclusion that first amendment rights may be waived by contract. Indeed, the defendant has not cited a single case that directly supports her claim to the contrary.

With regard to the text of the operative constitutional provisions, we conclude that this factor is neutral. We recognize that this court previously has held that fewer restrictions on speech are permitted under article first, §§ 4 and 5, of the constitution of Connecticut than are permitted under the first amendment. See *State* v.

*Linares*, 232 Conn. 345, 381, 655 A.2d 737 (1995).[25] Specifically, we concluded in *Linares* that the state constitution protects some forms of speech on government property that would not be protected under the federal forum based approach to such speech. Id., 377–86. The fact that our state constitutional provisions may permit fewer restrictions on speech than the first amendment permits does not necessarily mean, or even imply, however, that the state constitution categorically proscribes contractual waivers of the right to engage in that speech. Indeed, the defendant has pointed to no evidence that the framers intended to proscribe voluntary contractual restrictions on speech that would be protected from government interference under the state constitution. Cf. *Cologne* v. *Westfarms Associates*, 192 Conn. 48, 62, 469 A.2d 1201 (1984) ("[t]here is nothing in the history of [the Connecticut declaration of rights or the federal constitution's bill of rights] to suggest that they were intended to guard against private interference with [free speech] rights"). In light of the strong public policy favoring freedom of contract, we decline to presume that the framers had such an intent in the absence of any such evidence. For the same reasons, we conclude, under the third and fourth prongs of *Geisler*, that

[25] We stated in *Linares*: "Article first, § 4, of the Connecticut constitution provides that [e]very citizen may freely speak, write and publish his sentiments *on all subjects*, being responsible for the abuse of that liberty. . . . By contrast, the first amendment does not include language protecting free speech on all subjects. Article first, § 5, [of the Connecticut constitution] provides that [n]o law shall *ever* be passed to curtail or restrain the liberty of speech or of the press. . . . Unlike the first amendment which provides that Congress shall pass no law the use of ever in our state constitution offers additional emphasis to the force of the provision. Finally, article first, § 14, [of the Connecticut constitution] provides that citizens have a right, inter alia, to apply to those invested with the powers of government, for redress of grievances . . . by petition, address or *remonstrance*. . . . Again, our state constitution offers language, i.e., remonstrance, that sets forth free speech rights more emphatically than its federal counterpart. . . . [T]hese differences warrant an interpretation separate and distinct from that of the first amendment." (Emphasis in original; internal quotation marks omitted.) *State* v. *Linares*, supra, 232 Conn. 381.

our decision in *Linares* and the history of the state constitutional provisions do not support the defendant's claim.

With respect to other state precedents, the defendant relies on a number of New York cases in support of her claim that our state constitution proscribes the contractual waiver of free speech rights.[26] These cases, however, do not address the scope of speech rights under the state constitution, but merely stand for the proposition that a contractual waiver of first amendment rights is valid and binding unless it violates the public policy embodied in the first amendment. The defendant also points to a number of cases from other states that have held that a court proceeding may not be closed to the public merely because of the celebrity status of the parties,[27] and argues that, "if public openness cannot be overcome by a person's celebrity status, a person's ability to speak about those proceedings similarly cannot be abridged simply because one of the parties to the litigation is a wealthy celebrity." The short response to this argument is that the defendant's right to free speech is not restricted because of the plaintiff's celebrity status, but because of the defendant's intelligent and voluntary execution of the confidentiality agreement. Accordingly, we conclude that other state precedents do not support the defendant's claim.

Finally, we address the defendant's claim that contemporary understandings of applicable economic and

---

[26] See *Speken* v. *Columbia Presbyterian Medical Center*, 304 App. Div. 2d 489, 759 N.Y.S.2d 47, appeal denied, 100 N.Y.2d 511, 789 N.E.2d 348, 766 N.Y.S.2d 164 (2003); *Anonymous* v. *Anonymous*, 233 App. Div. 2d 162, 163, 649 N.Y.S.2d 665 (1996); *Trump* v. *Trump*, 179 App. Div. 2d 201, 204, 582 N.Y.S.2d 1008, appeal dismissed, 80 N.Y.2d 892, 600 N.E.2d 634, 587 N.Y.S.2d 907 (1992).

[27] See *NBC Subsidiary (KNBC-TV), Inc.* v. *Superior Court*, 20 Cal. 4th 1178, 1225, 980 P.2d 337, 86 Cal. Rptr. 2d 778 (1999); *Reiter* v. *Mason*, 563 So. 2d 749, 750–52 (Fla. App. 1990); *Merrick* v. *Merrick*, 154 Misc. 2d 559, 561–63, 585 N.Y.S.2d 989 (1992), aff'd, 190 App. Div. 2d 516, 593 N.Y.S.2d 192 (1993).

sociological norms support her position. She contends that "[o]ur modern climate calls for litigation to be conducted in a public rather than a secret setting" and "[t]o restrict the defendant's ability to freely comment about litigation with her celebrity spouse contravenes this Connecticut public policy." We agree with the defendant's contention that there is a strong public policy in Connecticut favoring open courts. See, e.g., *Doe* v. *Connecticut Bar Examining Committee*, 263 Conn. 39, 65, 818 A.2d 14 (2003) ("[t]he presumption of openness of court proceedings . . . is a fundamental principle of our judicial system"). Pursuant to this public policy, "the public may not be excluded from judicial proceedings, and . . . records of court proceedings may not be sealed, unless the court identifies, on the record and in open court, 'an interest which is determined to override the public's interest in attending such proceeding or in viewing such materials.' Practice Book § 11-20 (b)." *Doe* v. *Connecticut Bar Examining Committee*, supra, 68. The present case, however, does not concern court proceedings or court files. Instead, it is limited to the question of whether private parties can agree not to provide information to the press and public. We conclude, therefore, that the public policy favoring open courts does not support the defendant's claim under the state constitution.[28]

In summary, none of the six *Geisler* considerations supports the defendant's claim that her speech rights under article first, §§ 4 and 5, of the constitution of

[28] Although the confidentiality agreement contained a provision requiring discovery materials to be filed with the court under seal and to be kept confidential, the trial court found that "[t]here are no orders in this case that limit access of the public to the court file, to exhibits entered into evidence, or to courtroom proceedings." Thus, the parties apparently never invoked this provision. The defendant makes no reference to this provision in her brief to this court, and, indeed, she concedes that the confidentiality agreement restricts her "from publicly commenting about litigation *that is already a matter of public record*." (Emphasis added.)

Connecticut cannot be waived and one consideration—federal precedent—weighs against it. Accordingly, we reject this claim.

## IV

We next address the defendant's claim that the confidentiality agreement is unenforceable because it violates the public policy favoring free speech and open access to the courts.[29] We disagree.

At the outset, we address the plaintiff's claim that this issue was not raised at trial and, therefore, the decision of the trial court may be reversed only if we conclude that the court's enforcement of the confidentiality agreement was plain error. See Practice Book § 60-5 ("[t]he court may in the interests of justice notice plain error not brought to the attention of the trial court"). The defendant contends that she raised her claim that the confidentiality agreement violated public policy "in [her] opposition to the restraining order, her trial brief in support of that opposition, and her oral argument during the hearing on the prior restraint

---

[29] The plaintiff contends that the defendant's argument that the confidentiality agreement violates the public policy favoring free speech "is . . . in reality nothing more than her constitutional argument dressed up in a different outfit. It does not provide, absent this court's determination that her constitutional claim has merit, any independent public policy grounds for reversal." Thus, the plaintiff appears to argue that, if a party has waived a constitutional right, the party necessarily has waived any rights arising from the public policy underlying the constitutional provision. The defendant's constitutional claim, however, is that the confidentiality agreement cannot be enforced because it is not narrowly tailored to advance a compelling state interest. It does not necessarily follow from our rejection of that claim that the agreement comports with the public policy of the state. As we explain in the body of this opinion, many courts have taken a two step approach to claims involving contractual waivers of constitutional rights. They first consider whether the waiver violates the constitution. If it does not, they then consider whether there are, nevertheless, compelling public policy reasons not to enforce the waiver. These reasons frequently involve interests beyond the private interests of the parties. Because these interests might otherwise be ignored, we find this to be a sensible approach.

orders." She does not identify, however, where in the record she raised this claim. We have reviewed the defendant's briefs to the trial court and the transcript of the hearing on the plaintiff's motion for a restraining order and conclude that, although the defendant argued that it would be unfair and unconstitutional to enforce the confidentiality agreement, she did not expressly raise or brief a claim that, even if she had waived her constitutional rights, the confidentiality agreement was void on the ground that it violated the public policies favoring free speech and open courts. Because she adequately has briefed the issue in her appellate brief and has requested review of any unpreserved claims under the plain error doctrine, we consider whether the defendant's claim implicates plain error. See *State* v. *Myers*, 290 Conn. 278, 287–89, 963 A.2d 11 (2009) (although plain error doctrine is rule of reversibility, not of reviewability, predicates to consideration of such claims are adequate record and determination of whether record reflects plain error).

The plain error doctrine, which is "codified at Practice Book § 60-5, is an extraordinary remedy used by appellate courts to rectify errors committed at trial that, although unpreserved, are of such monumental proportion that they threaten to erode our system of justice and work a serious and manifest injustice on the aggrieved party. . . . [I]t is a doctrine that this court invokes in order to rectify a trial court ruling that, although either not properly preserved or never raised at all in the trial court, nonetheless requires reversal of the trial court's judgment, for reasons of policy. . . . In addition, the plain error doctrine is reserved for truly extraordinary situations [in which] the existence of the error is so obvious that it affects the fairness and integrity of and public confidence in the judicial proceedings. . . . Plain error is a doctrine that should be invoked sparingly. . . . Implicit in this very demanding standard is

the notion . . . that invocation of the plain error doctrine is reserved for occasions requiring the reversal of the judgment under review. . . . [Thus, an appellant] cannot prevail under [the plain error doctrine] . . . unless he demonstrates that the claimed error is both so clear and so harmful that a failure to reverse the judgment would result in manifest injustice." (Citations omitted; internal quotation marks omitted.) Id., 289.

This court has held that "[t]he principle that agreements contrary to public policy are void should be applied with caution and only in cases plainly within the reasons on which that doctrine rests; and it is the general rule . . . that competent persons shall have the utmost liberty of contracting and that their agreements voluntarily and fairly made shall be held valid and enforced in the courts." (Internal quotation marks omitted.) *Collins* v. *Sears, Roebuck & Co.,* 164 Conn. 369, 376–77, 321 A.2d 444 (1973).

A number of courts have concluded that, even if a party is found to have validly waived constitutional free speech rights, the waiver may be unenforceable "if the interest in its enforcement is outweighed in the circumstances by a public policy harmed by enforcement of the agreement." (Internal quotation marks omitted.) *Leonard* v. *Clark,* supra, 12 F.3d 890; see also *Erie Telecommunications, Inc.* v. *Erie,* supra, 853 F.2d 1099 (even where waiver of constitutional speech rights was knowing, voluntary and intelligent, "public policy must be considered as a factor in determining whether to give effect to a waiver of constitutional rights"); *Wilkicki* v. *Brady,* 882 F. Sup. 1227, 1234 (D.R.I. 1995) (applying public interest balancing test to determine enforceability of waiver of constitutional speech rights). The factors favoring enforcement of contractual waivers of constitutional free speech rights include the public policy favoring freedom of contract; *Collins* v. *Sears, Roebuck & Co.,* supra, 164 Conn. 376; the interest in

encouraging settlement of disputes; see *Wilkicki* v. *Brady*, supra, 1234; see also *Billington* v. *Billington*, 220 Conn. 212, 221, 595 A.2d 1377 (1991) (policy of encouraging private settlement also applies to marital dissolutions); protecting the "fundamental principle of personal autonomy"; *Wilkicki* v. *Brady*, supra, 1234; and the fact that the agreement "involves private litigants, and concerns matters of little legitimate public interest." *Pansy* v. *Stroudsburg*, 23 F.3d 772, 788 (3d Cir. 1994).

Factors that have weighed against the enforcement of contractual waivers include the " 'critical importance' " of the right to speak on matters of public concern; *Leonard* v. *Clark*, supra, 12 F.3d 891; the fact that the agreement restricts a party from communicating with a public agency regarding the enforcement of civil rights laws; *Equal Employment Opportunity Commission* v. *Astra USA, Inc.*, 94 F.3d 738, 744 (1st Cir. 1996);[30] the fact that the agreement requires the suppression of criminal behavior; *Bowman* v. *Board of Education*, 44 Ohio App. 3d 169, 172, 542 N.E.2d 663 (1988); the fact that the information being suppressed is important to protecting the public health and safety; *Pansy* v.

---

[30] In *Equal Employment Opportunity Commission* v. *Astra USA, Inc.*, supra, 94 F.3d 740–41, the defendant challenged "a preliminary injunction restraining it from entering into or enforcing settlement agreements containing provisions that prohibit settling employees both from filing charges of sexual harassment with the Equal Employment Opportunity Commission [the commission] . . . and from assisting the [c]ommission in its investigation of any such charges." The United States Court of Appeals for the First Circuit rejected this challenge, stating that "[t]he right to assist the [commission] is not a damages-driven right. . . . In contrast to the individual right to recover damages . . . an employee's right to communicate with the [commission] must be protected not to safeguard the settling employee's entitlement to recompense but instead to safeguard the public interest. Hence, it is not a right that an employer can purchase from an employee, nor is it a right that an employee can sell to her employer. Thus, a waiver of the right to assist the [commission] offends public policy . . . . " (Citation omitted.) Id., 744 n.5; see also *Chambers* v. *Capital Cities/ABC*, 159 F.R.D. 441, 444–45 (S.D.N.Y 1995).

*Stroudsburg*, supra, 23 F.3d 787; and the fact that the party benefiting from the confidentiality provision is a public entity or official. Id., 788. Courts also have considered whether the contractual restriction on speech was tailored to advance the primary purpose of the contract. See *Equal Employment Opportunity Commission* v. *Astra USA, Inc.*, supra, 744; *Leonard* v. *Clark*, supra, 891–92; *Forbes* v. *Milwaukee*, United States District Court, Docket No. 05-C-591 (E.D. Wis. January 4, 2007).

In the present case, we conclude that these factors weigh in favor of enforcing the confidentiality agreement. The agreement does not prohibit the disclosure of information concerning the enforcement of laws protecting important rights, criminal behavior,[31] the public health and safety or matters of great public importance,[32] and the plaintiff is not a public official.

---

[31] The defendant claims, to the contrary, that, because "the disclosure of criminal behavior could constitute a breach" of the confidentiality agreement, the agreement is void. In support of this claim, she cites *McKenzie* v. *Lynch*, 167 Mich. 583, 585, 133 N.W. 490 (1911), in which the Supreme Court of Michigan held that a settlement agreement providing that the defendant would not do anything to attract publicity to the underlying litigation—a claim for damages by the defendant against the plaintiff for the plaintiff's alleged involvement with the defendant's wife—was void as violating the public policy that a "wronged husband or wife may not settle a criminal prosecution for the wrong of the guilty spouse." We do not agree with the defendant that this case stands for the broad proposition that the *potential* that disclosure of criminal behavior could be found to constitute a breach of a confidentiality agreement invalidates the agreement. The court in *McKenzie* apparently concluded that the primary *purpose* of the settlement provision was to contract away the right to bring a criminal prosecution. See id., 586 (characterizing provision as contract to sell right to institute criminal proceedings). That was not the purpose of the confidentiality agreement in the present case and there is no evidence that its enforcement will have that effect. Accordingly, there is no need to consider whether the agreement would be enforceable under those circumstances.

[32] The defendant contends that "the public is denied the benefit of the litigants' insight and experience" if the confidentiality agreement is enforced. Relying on *Nebraska Press Assn.* v. *Stuart*, 427 U.S. 539, 559, 570, 96 S. Ct. 2791, 49 L. Ed. 2d 683 (1976), in which the United States Supreme Court invalidated an order by a Nebraska trial judge prohibiting the press from

Moreover, the restrictions on speech imposed by the confidentiality agreement are tailored to advance its primary purpose of protecting the value of the plaintiff's business. Accordingly, we conclude that the confidentiality agreement did not violate the public policy favoring free speech. In addition, for the reasons stated in part III of this opinion, we conclude that the confidentiality agreement does not implicate the public policy favoring open courts. We conclude, therefore, that the trial court did not commit plain error when it determined that the confidentiality agreement was enforceable.

V

Finally, we address the defendant's claim that the confidentiality agreement is void for indefiniteness. We disagree.

The defendant makes no claim that she raised this issue before the trial court. Accordingly, the decision of the trial court may be reversed only if we conclude that the confidentiality agreement was so indefinite that its enforcement by the trial court was plain error. The standard of review for claims of plain error is set forth in part IV of this opinion.

---

publishing certain information about a pending criminal case, the defendant argues that "truthful reports of public judicial proceedings" are entitled to special protection. Because *Stuart* did not involve a private party's voluntary and intelligent contractual waiver of speech rights, however, we conclude that it is inapposite.

The defendant in the present case also contends that, because the dissolution proceedings already are a matter of public record, she cannot be precluded from disseminating information about them. Cf. *Cherne Industrial, Inc.* v. *Grounds & Associates, Inc.*, 278 N.W.2d 81, 90 (Minn. 1979) ("matters of general knowledge within the industry may not be classified as trade secrets or confidential information entitled to protection" [internal quotation marks omitted]). The defendant's personal views on those proceedings, however, are not public. Nor are they a matter of great public concern. Finally, the defendant makes no claim that the confidentiality order prohibits her from pursuing legitimate complaints of judicial impropriety. Accordingly, we need not consider its enforceability in that context.

"Under established principles of contract law, an agreement must be definite and certain as to its terms and requirements. . . . 1 Restatement (Second), Contracts [§ 33, p. 92] (1981) . . . ." (Citations omitted; internal quotation marks omitted.) *Dunham* v. *Dunham*, 204 Conn. 303, 313, 528 A.2d 1123 (1987), overruled in part on other grounds by *Santopietro* v. *New Haven*, 239 Conn. 207, 213 n.8, 682 A.2d 106 (1996). "The terms of a contract are reasonably certain if they provide a basis for determining the existence of a breach and for giving an appropriate remedy." 1 Restatement (Second), supra, § 33 (2), p. 92; see also *Coady* v. *Martin*, 65 Conn. App. 758, 767, 784 A.2d 897 (2001), cert. denied, 259 Conn. 905, 789 A.2d 993 (2002). "[T]he degree of certainty required may be affected by the dispute which arises and by the remedy sought. Courts decide the disputes before them, not other hypothetical disputes which might have arisen." 1 Restatement (Second), supra, § 33, comment (b), p. 93.

The defendant in the present case claims that the confidentiality agreement is so indefinite as to be unenforceable because "virtually any comment that the defendant makes about the plaintiff, that could at all be interpreted as disrespectful, would come within the meaning of the prohibited speech. For example, were the defendant to admit to a member of the media that she and the plaintiff had divorced, she might find herself accused of breach because the perception that the plaintiff had a failed marriage could be interpreted to 'disparage' him. Moreover, the scope of the provision prohibits the defendant from even speaking about herself in a manner that could be perceived as disparaging." None of these circumstances, however, is present in this case. Rather, the plaintiff sought the restraining order to prevent the defendant from appearing on a "nationally broadcast television show to discuss the plaintiff, [the defendant's] marriage to the plaintiff, and the pending

custody litigation."[33] Because the foregoing claims of indefiniteness involve hypothetical situations, we decline to address them.

The defendant also claims that "[i]t is unclear whether [the confidentiality agreement's prohibition on speaking to] the press is limited to the printed press or to all news media providers, or even individuals with personal Internet blogs. It is even more unclear who is encompassed by the public. It is possible that this proscribes comments in Internet chatrooms or even conversations with her mother, her best friend, her psychologist or her daughter's [physician]." To the extent that the defendant challenges the trial court's determination that the confidentiality agreement's prohibition on disseminating information to the press and the public applies to appearances on radio or television, we conclude that that determination did not constitute plain error. The conclusion was supported both by the express purpose of the agreement to protect the value of the plaintiff's business and by the ordinary meaning of the word "press." See Merriam-Webster's Collegiate Dictionary (10th Ed. 1993) (defining "press" in relevant part as "b: newspapers, periodicals, and often radio and television news broadcasting c: news reporters, publishers, and broadcasters"). Thus, a reasonable person of ordinary experience and intelligence would understand the confidentiality agreement's prohibition on the "[d]isclosure to the press or public of any information related to this litigation" to apply, at the very minimum, to an appearance on a nationally broadcast television program to discuss the plaintiff, the marriage

---

[33] The plaintiff also alleged in his motion for a restraining order that the defendant intended to disparage him during the television appearance. The defendant did not dispute this claim before the trial court or on appeal to this court, but claimed only that the confidentiality agreement was unenforceable.

and the pending custody litigation.[34] Accordingly, we conclude that the confidentiality agreement "provide[d] a basis for determining the existence of a breach and for giving an appropriate remedy." 1 Restatement (Second), supra, § 33 (2), p. 92. We therefore reject this claim.[35]

The judgment is affirmed.

In this opinion the other justices concurred.

---

[34] Cf. *Ruzicka* v. *Conde Nast Publications, Inc.*, 733 F. Sup. 1289, 1298 (D. Minn. 1990) (when plaintiff agreed to speak to defendant reporter on condition that plaintiff not be "identified" or "identifiable" in article about plaintiff, "open-ended term such as 'identifiable' provided too little guidance to the defendants about the extent to which they might be held to have waived their first amendment right to publish"), remanded in part on other grounds, 939 F.2d 578 (8th Cir. 1991).

[35] The portion of the trial court's order prohibiting the defendant "[f]rom disseminating to the media *or to any person, other than to her counsel in this litigation or to others duly authorized* by the [c]onfidentiality [a]greement, the protective order or further court order (i) any information pertaining to the dissolution action between the parties or to postjudgment proceedings between them . . . or (iii) any derogatory or defamatory information about the parties"; (emphasis added); arguably is broader than the confidentiality agreement, which prohibited the dissemination of this type of information only to the public and the press. The agreement's prohibition on disclosure of information to "any person," other than those specifically authorized, applied only to " 'confidential discovery material' " and " 'discovery material' . . . ." Because the sole issue before the trial court was the enforceability of the confidentiality agreement, there was no occasion for the court to modify the scope of the agreement. As we have indicated, however, because the dispute before the trial court arose from a claim that the defendant intended to disseminate information about the plaintiff to the press and public, the court's order had no broader *effect* than the confidentiality agreement. Nothing in this opinion prevents the defendant from seeking a modification of the order as it may apply in the future to other contemplated conduct that is not clearly within the scope of the confidentiality agreement.